# EXHIBIT 1

PAUL HOFFMAN #71244
JOHN WASHINGTON #315991
Schonbrun, Seplow, Harris,
   Hoffman & Zeldes LLP
200 Pier Avenue, Suite 226
Hermosa Beach, CA 90254
T: (424) 297-0114
F: (310) 399-7040
hoffpaul@aol.com

*Counsel for all Plaintiffs\**

*\*See Signature Page for Complete List of
Plaintiffs*

CARRIE DECELL, *Pro Hac Vice*
JAMEEL JAFFER, *Pro Hac Vice*
ALEX ABDO, *Pro Hac Vice*
STEPHANIE KRENT, *Pro Hac Vice*
EVAN WELBER FALCÓN, *Pro Hac Vice*
Knight First Amendment Institute
   at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
carrie.decell@knightcolumbia.org

*Counsel for all Plaintiffs\**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| CARLOS DADA, SERGIO ARAUZ, GABRIELA CÁCERES GUTIÉRREZ, JULIA GAVARRETE, ROMAN GRESSIER, GABRIEL LABRADOR, ANA BEATRIZ LAZO ESCOBAR, EFREN LEMUS, DANIEL LIZÁRRAGA, CARLOS LÓPEZ SALAMANCA, CARLOS MARTÍNEZ, ÓSCAR MARTÍNEZ, MARÍA LUZ NÓCHEZ, VÍCTOR PEÑA, NELSON RAUDA ZABLAH, DANIEL REYES MARTÍNEZ, MAURICIO SANDOVAL SORIANO, and JOSÉ LUIS SANZ,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>　　　　　Defendants. | Case No. 3:22-cv-07513-WHA<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

**INTRODUCTION**

2      1.      Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited

3    develop spyware—malicious surveillance software—and sell it to rights-abusing governments.

4    With Defendants' technology and assistance, these governments surveil journalists, human rights

5    advocates, and political opponents, often in the service of broader campaigns of political

6    intimidation and persecution. As the U.S. Department of Commerce observed last year when it

7    added NSO Group to its "Entity List," Defendants' spyware has enabled authoritarian governments

8    to "conduct transnational repression"—to reach across borders and stifle dissent. In recent years,

9    the supply of spyware to authoritarian and other rights-abusing governments, by Defendants and

10   other mercenary spyware companies, has become a grave and urgent threat to human rights and

11   press freedom around the world.

12     2.      Defendants' signature product, usually sold under the name "Pegasus," is a

13   particularly sophisticated and insidious type of spyware. Defendants and their clients can install

14   Pegasus on a target's smartphone remotely and surreptitiously, without any action by the target.

15   Once installed, Pegasus gives its operators essentially full control of the device. They can covertly

16   extract contact lists, calendar entries, text and instant messages, notes, emails, search histories, and

17   GPS locations. They can turn on the smartphone's microphone to record surrounding sounds. They

18   can activate the smartphone's camera to take photographs. They can also copy authentication keys

19   to gain access to cloud-based accounts. Defendants highlight these and other capabilities in their

20   marketing materials.

21     3.      Defendants developed Pegasus, and deploy it, by repeatedly accessing computer

22   servers owned by U.S. technology companies, including Apple Inc., a company based in

23   Cupertino, California. As relevant to this case, Defendants accessed Apple servers to identify and

24   exploit vulnerabilities in Apple software and services, to enable the delivery of Pegasus to targets'

25   iPhones, and to allow Pegasus operators to extract data from their targets' iPhones and their targets'

26   cloud-based accounts. On information and belief, some of the Apple servers that Defendants

27   abused to facilitate the delivery and operation of Pegasus in this case are located in California. In

28   November 2021, Apple sued Defendants in this district, asserting that, through their development

and deployment of spyware, they had exploited Apple's software and services, damaged its business and goodwill, and injured its users.

4.     Plaintiffs in this case include journalists and others who write, produce, and publish El Faro, a digital newspaper based in El Salvador that has become one of the foremost sources of independent news in Central America—in the words of the International Press Institute, a "paragon of investigative journalism . . . with its fearless coverage of violence, corruption, inequality, and human rights violations." El Faro has a broad readership not only in Central America, but also in the United States, and particularly here in California. Plaintiffs include Carlos Dada, El Faro's co-founder and director; Roman Gressier, an El Faro reporter who is a U.S. citizen; Nelson Rauda Zablah, a former El Faro reporter who currently lives in the United States; José Luis Sanz, the Washington correspondent for El Faro, who also currently lives in the United States; and fourteen other El Faro employees.

5.     Between June 2020 and November 2021, at least twenty-two people associated with El Faro, including Plaintiffs, were the victims of Pegasus attacks. Their devices were accessed remotely and surreptitiously, their communications and activities monitored, and their personal data accessed and stolen. Many of these attacks occurred when they were communicating with confidential sources, including U.S. Embassy officials, and reporting on abuses by the Salvadoran government. The journalists and others who were the victims of these Pegasus attacks learned of them only much later. When they came to light, the attacks were condemned by human rights and press freedom groups around the world. For example, a coalition of civil society groups from Central America and the United States issued a joint statement in January 2022 denouncing the attacks and decrying "[t]he lack of accountability for such egregious conduct by public authorities and private companies."

6.     The Pegasus attacks have profoundly disrupted Plaintiffs' lives and work. The attacks have compromised Plaintiffs' safety as well as the safety of their colleagues, sources, and family members. The attacks have deterred some sources from sharing information with Plaintiffs. Some Plaintiffs have been diverted from pressing investigative projects by the necessity of assessing which data was stolen, and of taking precautions against the possibility that the stolen

1    data will be exploited. Plaintiffs have also had to expend substantial resources to protect their

2    devices against possible future attacks, to ensure their personal safety, and to address serious

3    physical and mental health issues resulting from the attacks. The attacks have undermined the

4    security that is a precondition for the independent journalism that El Faro strives to provide its

5    readers, as well as the ability of El Faro's readers, including those in the United States, to obtain

6    independent analysis of events in Central America.

7         7.    Defendants' development and deployment of Pegasus against Plaintiffs was

8    unlawful. It violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the California

9    Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, and it constituted

10   trespass to chattels and intrusion upon seclusion. This is a suit for injunctive and declaratory relief,

11   as well as compensatory and punitive damages.

12                           **JURISDICTION AND VENUE**

13        8.    This Court has jurisdiction over Plaintiffs' federal causes of action pursuant to 28

14   U.S.C. § 1331.

15        9.    This Court has jurisdiction over Plaintiffs' state law causes of action pursuant to 28

16   U.S.C. § 1367, because these claims arise out of the same nucleus of operative fact as Plaintiffs'

17   federal statutory claims.

18        10.   This Court has personal jurisdiction over Defendants because Defendants have

19   purposefully availed themselves of California as a forum and have purposefully directed their

20   tortious activities at California. A court in this district exercised personal jurisdiction over

21   Defendants based on substantially similar facts in *WhatsApp Inc. v. NSO Group Technologies*

22   *Limited*, 472 F. Supp. 3d 649 (N.D. Cal. 2020).

23        11.   Alternatively, this Court has personal jurisdiction over Defendants pursuant to

24   Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' claims arise under federal law; if

25   Defendants are not subject to jurisdiction in California, then they are not subject to jurisdiction in

26   any state's courts of general jurisdiction; and exercising jurisdiction over Defendants is consistent

27   with U.S. law and the U.S. Constitution.

28

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(3).

## DIVISIONAL ASSIGNMENT

13. Pursuant to Civil Local Rule 3-2(e), this case may be assigned to the San Jose division because a substantial part of the events giving rise to Plaintiffs' claims occurred in Santa Clara County, where Apple is located.

## PARTIES

### *Plaintiffs*

14. Plaintiff Carlos Dada is the director of El Faro, which he co-founded in 1998. His reporting focuses on corruption and violence, and he has reported from numerous conflict zones, including in Guatemala, Honduras, Iraq, Mexico, and Venezuela. In 2011, he won the Maria Moors Cabot Prize for Latin American Reporting. In 2022, he was honored by the International Press Institute and International Media Support with a World Press Freedom Hero award, which recognizes "journalists who have made significant contributions to promote press freedom, particularly in the face of great personal risk." He also won the 2022 International Center for Journalists' Knight Trailblazer Award for "his hard-hitting investigative reporting, lyrical writing and visionary leadership." He lives in San Salvador, El Salvador.

15. Plaintiff Sergio Arauz is the deputy editor-in-chief of El Faro, where he has worked since 2001. His reporting focuses on politics and human rights. He lives in San Salvador.

16. Plaintiff Gabriela Cáceres Gutiérrez is a reporter for El Faro, where she has worked since 2018. In 2021, she, along with Plaintiffs Carlos Martínez and Óscar Martínez, undertook one of El Faro's most significant investigations, revealing secret negotiations held in maximum security prisons between the Bukele Administration and incarcerated members of El Salvador's three main gangs: Mara Salvatrucha ("MS-13"), Barrio 18 Revolucionarios, and Barrio 18 Sureños. She lives in San Salvador.

17. Plaintiff Julia Gavarrete is a reporter for El Faro, where she has worked since 2021. She has more than a decade of experience reporting in El Salvador and Central America, and her reporting focuses on vulnerable communities in Central America, on women's rights, and on

environmental issues. She currently lives in Berlin, Germany while on a four-month fellowship with Reporters Sans Frontières.

18.     Plaintiff Roman Gressier is a reporter for El Faro, where he has worked since November 2019. He writes El Faro's English-language newsletter and has reported extensively on Central American politics, human rights, and press freedom. He is a dual citizen of the United States and France.

19.     Plaintiff Gabriel Labrador is a reporter for El Faro, where he has worked since 2011. He has been a reporter for more than eighteen years, and he has reported extensively on criminal justice and public corruption, including on a Salvadoran Supreme Court magistrate's ties to the MS-13 gang, on the political and policymaking roles of President Bukele's brothers, and on detentions during El Salvador's recent "state of exception." He lives in San Salvador.

20.     Plaintiff Ana Beatriz Lazo Escobar is a marketing manager for El Faro, where she has worked since 2015. She lives in Tamanique, El Salvador.

21.     Plaintiff Efren Lemus is a reporter for El Faro, where he has worked since 2011. He has written about gang violence and El Salvador's attempts to curtail it, about the treatment of detainees during El Salvador's state of exception, and about accusations of wrongdoing and corruption within the governing Nuevas Ideas party. He also co-wrote an in-depth profile of the MS-13 gang for The New York Times. He lives in San Salvador.

22.     Plaintiff Daniel Lizárraga currently works for the Institute for War and Peace Reporting as the coordinator for investigative journalism projects in Latin America and Cuba. Mr. Lizárraga previously worked for El Faro, where he served as the investigations editor from January to August 2021. His reporting focuses on corruption, and his work has been recognized with a Gabriel García Márquez Award from the New Journalism Foundation and a Mexican National Journalism Award. He lives in Mexico City, Mexico.

23.     Plaintiff Carlos López Salamanca is the general manager of El Faro, where he has worked for four years. He lives in San Salvador.

24.     Plaintiff Carlos Martínez is a reporter for El Faro, where he has worked since 2004. He is one of the founding members of Sala Negra, El Faro's investigative journalism team. His

1   reporting focuses on gang violence and official misconduct. He has worked on some of El Faro's

2   most important stories, including an investigation into the Bukele Administration's secret

3   negotiations with incarcerated gang members, and he co-wrote an in-depth profile of the MS-13

4   gang for The New York Times. He lives in La Libertad, El Salvador.

5        25.    Plaintiff Óscar Martínez is the editor-in-chief of El Faro, where he has worked since

6   January 2007. A founding member of Sala Negra, he reports on issues of gang violence, migration,

7   and official misconduct. He has been awarded the Fernando Benítez National Journalism Award

8   in Mexico, the José Simeón Cañas Central American University in El Salvador Human Rights

9   Prize, and the Maria Moors Cabot Prize. He lives in San Salvador.

10        26.    Plaintiff María Luz Nóchez is a reporter and the Opinion editor for El Faro, where

11   she has worked since 2011. She reports on arts and culture, violence against women and the

12   LGBTQ community, and the rights of Indigenous people. She lives in Santa Tecla, El Salvador.

13        27.    Plaintiff Víctor Peña is a photojournalist for El Faro, where he has worked since

14   2016. He contributes photography and other audiovisual and graphic material to El Faro, focusing

15   on issues relating to women's rights, inequality, pollution, and migration. He lives in San Salvador.

16        28.    Plaintiff Nelson Rauda Zablah worked as a reporter and hosted a twice-weekly

17   radio show for El Faro from 2015 to August 2022. He has a decade of experience covering

18   corruption, crime, the justice system, politics, migration, and human rights. His work has also been

19   published in The New York Times, The Washington Post, the Los Angeles Times, ProPublica, the

20   BBC, and El Diario. He previously served as secretary to the Board of Directors of the Asociación

21   de Periodistas de El Salvador, the Salvadoran journalists' association. He currently lives in New

22   York City while pursuing a master's degree at Columbia Journalism School.

23        29.    Plaintiff Daniel Reyes Martínez is the chief technology officer of El Faro, where

24   he has worked for six years. He lives in Antiguo Cuscatlán, El Salvador.

25        30.    Plaintiff Mauricio Ernesto Sandoval Soriano is the general administrator of El Faro,

26   where he has worked since 2018. He lives in Antiguo Cuscatlán.

27        31.    Plaintiff José Luis Sanz is the Washington correspondent for El Faro, where he has

28   worked since 2001. He was the director of El Faro from 2014 to December 2020. A founding

member of Sala Negra, he previously reported on issues of violence, gangs, and organized crime in Central America. He now reports on human rights, migration, and corruption. He currently lives in Washington, D.C.

*Defendants*

32.     Defendant NSO Group Technologies Limited is a limited liability company that was incorporated in Israel on January 25, 2010. NSO Group develops highly sophisticated spyware; sells that spyware to government clients around the world, including to governments associated with grave abuses of human rights; trains those clients in the use of the spyware; and assists those clients in its deployment. NSO Group is a subsidiary of Q Cyber Technologies Limited, and, on information and belief, it sometimes operates under that name.

33.     Defendant Q Cyber Technologies Limited is a limited liability company. It was originally incorporated in Israel on December 2, 2013 under the name L.E.G.D. Company Limited, but changed its name to Q Cyber Technologies on May 29, 2016. Q Cyber is the parent company of NSO Group and a subsidiary of OSY Technologies SARL.

34.     As discussed further below, Defendants have purposefully directed their tortious activities at the State of California. They have also purposefully availed themselves of the United States, and the State of California in particular. For example, for most of the past decade, NSO Group has been principally funded and controlled by California-based companies, including Francisco Partners and Berkeley Research Group. In addition, Q Cyber established a U.S. sales arm called Westbridge Technologies, Inc. to market Defendants' spyware to law enforcement agencies across the United States. Omri Lavie, one of the three co-founders of NSO Group, co-founded and served as the CEO of Westbridge. Defendants and Westbridge hired U.S.-based firms to help market Defendants' spyware and oversee their public relations in the United States. Defendants and Westbridge endeavored to sell Defendants' technology to U.S. government agencies, including the Central Intelligence Agency, the Drug Enforcement Administration, and the Secret Service, as well as to local law enforcement agencies, including the Los Angeles and San Diego Police Departments. In 2019, Defendants sold a version of Pegasus to the Federal

1  Bureau of Investigation and trained FBI agents as they tested and evaluated the spyware. The FBI

2  ultimately paid Defendants roughly $5 million in fees.

3       35.     On information and belief, at all times material to this case, each Defendant was

4  the agent, partner, alter ego, subsidiary, parent, and/or co-conspirator of and with the other

5  Defendant, and the acts of each Defendant were within the scope of that relationship; each

6  Defendant knowingly and intentionally agreed with the other to carry out the acts alleged in this

7  Complaint; and in carrying out the acts alleged in this Complaint, each Defendant acted with the

8  knowledge, permission, and consent of the other, and each Defendant aided and abetted the other.

9                                    **FACTUAL ALLEGATIONS**

10                                          *Pegasus*

11      36.     Defendants develop highly sophisticated spyware; sell that spyware to government

12  clients around the world, including to governments associated with grave abuses of human rights;

13  train those clients in the use of the spyware; and assist those clients in its deployment.

14      37.     Defendants' signature product is called Pegasus. Plaintiffs use the term "Pegasus"

15  throughout this Complaint to refer to any of the products that Defendants market that are identical

16  or substantially similar to Pegasus.

17      38.     Pegasus enables its operators to take full control of a target's smartphone remotely

18  and surreptitiously. According to Defendants' marketing materials, Pegasus can be used to

19  remotely and covertly surveil and extract contact details, text messages, instant messages, notes,

20  emails, web-browsing activity, files, and passwords. It can be used to monitor phone calls and

21  VoIP calls, as well as user activity on different applications, including WhatsApp, Facebook, and

22  Skype. It can be used to track and log a device's GPS location. And it can be used to activate the

23  device's microphone to record surrounding sounds, and to activate the device's camera to take

24  photographs.

25      39.     Pegasus can also give its operators access to data stored in the cloud. According to

26  news reports, Pegasus allows its operators to copy the authentication keys that smartphones use to

27  access U.S.-based cloud services such as iCloud, Google Drive, and Facebook Messenger. Pegasus

28

operators can use those keys to gain access to data stored on those cloud servers—including documents and photographs—without the knowledge of the smartphone's user.

40.     It is practically impossible for individuals to protect themselves against Pegasus attacks. Pegasus can be installed surreptitiously, without the smartphone user's involvement or awareness, through "zero-click" attacks. It can be installed remotely, eliminating the need for physical proximity to a target's smartphone as well as any reliance on local mobile network operators. It can also circumvent ordinary security measures—such as the use of encryption—because it allows its operators to access an infected device as though they were the device's user. In addition, it is designed to subvert safeguards that would otherwise alert the target to its presence. On iPhones, for example, Pegasus disables crash reporting to Apple, and many of the malicious processes that Pegasus runs on a device following an infection have been given names similar to those of legitimate iOS system processes.

41.     Independent security researchers at the Citizen Lab at the University of Toronto's Munk School of Global Affairs & Public Policy—an organization that has conducted in-depth investigations of spyware attacks around the world—have concluded that Plaintiffs in this case were targeted through zero-click Pegasus attacks directed at their iPhones. Amnesty International's Security Lab independently confirmed the Citizen Lab's conclusion. Investigations by the Citizen Lab's researchers indicate that Defendants carried out these attacks in the stages described below. On information and belief, the Pegasus attacks against Plaintiffs required Defendants to interact extensively with Apple's U.S.-based servers, many of which are in California.

42.     First, Defendants identified vulnerabilities in Apple software and services that could be used in the process of infecting targeted iPhones with Pegasus. Defendants created Apple ID accounts specifically for the purpose of identifying these vulnerabilities. Ordinarily, Apple ID accounts are used by Apple to authenticate its customers when they use Apple services. In contrast, Defendants used their Apple ID accounts to discover vulnerabilities in Apple's software, to probe Apple's servers and services, and to test the software that Defendants developed to infect iPhones with Pegasus.

43.     Second, Defendants and their clients exploited the vulnerabilities that they identified to infect targeted iPhones with Pegasus. To initiate a zero-click attack, Defendants and their clients used the target's Apple ID or other information to confirm that the target was in fact using an iPhone, and then they used Defendants' own Apple ID accounts to send malicious data to the device by leveraging the communications between Apple's services and the targeted iPhone. The malicious data caused the device to retrieve Pegasus (and other malicious data precipitating the Pegasus infection) through a network of servers operated and/or maintained by Defendants. In this case, Plaintiffs' iPhones were infected using zero-click exploits known as KISMET and FORCEDENTRY. Defendants and their clients appear to have executed both of these exploits by using Apple ID accounts to send malicious data through Apple's iMessage service. In the case of at least FORCEDENTRY, the Pegasus file was stored temporarily, in encrypted form, on one of Apple's iCloud servers before delivery to a target's iPhone.

44.     Third, Pegasus operators used command-and-control servers to exploit the Pegasus infection, taking control of the infected iPhone. The operators could use these servers to issue commands to each infected device—for example, to exfiltrate data, to enable location tracking, or to record audio and take photographs using the device's microphone and camera. If a Pegasus operator extracted authentication keys from an infected iPhone, the operator could use those keys to access and extract data from the targeted individual's cloud-based accounts. Pegasus infections were sometimes short-lived (allowing operators to hack their targets' iPhones, exfiltrate data of potential interest, and then attempt to cover their tracks by deleting traces of the infection) and sometimes prolonged or "active" (allowing operators to conduct ongoing surveillance, albeit at greater risk of discovery). Even when Defendants' employees were not themselves the Pegasus operators at this stage of the attacks, Defendants remained involved by configuring and maintaining the operators' command-and-control servers, ensuring that infected devices were running the latest version of the Pegasus software, and providing ongoing technical assistance to the operators. Defendants also offered extensive customer support, including on-the-ground support during the initial deployment and/or continued operation of Pegasus, technical support by

email and phone, and engineer support through remote desktop software and/or a virtual private network.

45.     In July 2021, Amnesty International's Security Lab concluded that Defendants were, at that time, able to remotely and covertly compromise all recent iPhone models and versions of Apple's mobile operating system using the process described above or one similar to it.

### *The Threat Pegasus Poses to Press Freedom and Human Rights*

46.     Defendants have sold Pegasus to authoritarian and rights-abusing governments around the world, and many of those governments have used the spyware to target journalists, human rights activists, and political opponents.

47.     According to the Pegasus Project, a collaboration of more than eighty journalists from seventeen media organizations in ten countries, at least 180 journalists from twenty countries have been selected as targets of Pegasus attacks by authoritarian or rights-abusing governments. Saudi authorities used Pegasus to surveil family members and close associates of journalist Jamal Khashoggi—whom Saudi agents brutally murdered in 2018—as well as other Saudi activists, an Amnesty International staff member, and an American New York Times journalist who has reported extensively on the country. Morocco used Pegasus to spy on journalist Omar Radi. Mexican officials used Pegasus to surveil journalists and lawyers investigating corruption and human rights abuses in the country. Hungarian Prime Minister Viktor Orbán also used Pegasus to surveil journalists, lawyers, and social activists.

48.     Prominent human rights activists, diplomats, and political opposition figures, too, have been frequent victims of Pegasus attacks. For example, in 2021 alone, Defendants' clients used Pegasus to surveil U.S. diplomats working in Uganda; Carine Kanimba, a dual U.S.–Belgian citizen who was targeted while she was campaigning for the release of her father, Hotel Rwanda hero Paul Rusesabagina, from detention; Lama Fakih, a prominent Lebanese activist and Human Rights Watch director; at least four members of the civic youth movement "Oyan, Qazaqstan" ("Wake Up, Khazakhstan"); and at least thirty pro-democracy protesters and activists in Thailand. In 2020, more than sixty pro-Catalonian independence activists were the victims of Pegasus attacks. And in 2019, at least three human rights activists in India were surveilled with Pegasus

1  while they were advocating for the release of other imprisoned activists, and Polish senator

2  Krzysztof Brejza was surveilled with Pegasus while he was running a parliamentary election

3  campaign.

4      49.   The supply of spyware to authoritarian and rights-abusing regimes, by Defendants

5  and other mercenary spyware manufacturers like them, is now widely understood to present an

6  urgent challenge to press freedom around the world.

7      50.   In November 2021, the U.S. Department of Commerce added NSO Group to its

8  "Entity List" based on evidence that it had "supplied spyware to foreign governments that used"

9  the spyware "to maliciously target government officials, journalists, businesspeople, activists,

10  academics, and embassy workers," as well as to target "dissidents, journalists and activists outside

11  of their sovereign borders to silence dissent." The Commerce Department described the

12  designation of NSO Group as part of a broader effort to "stem the proliferation of digital tools used

13  for repression" and to "improv[e] citizens' digital security, combat[] cyber threats, and mitigat[e]

14  unlawful surveillance." In June 2022, the Biden Administration opposed U.S. government

15  contractor L3Harris Technologies' bid to acquire NSO Group, observing that Pegasus had been

16  "misused around the world to enable human rights abuses, including to target journalists, human

17  rights activists, or others perceived as dissidents and critics." And in its October 2022 National

18  Security Strategy, the Biden Administration pledged "to counter the exploitation of American's

19  [sic] sensitive data and illegitimate use of technology, including commercial spyware and

20  surveillance technology," and to "stand against digital authoritarianism."

21      51.   Congress has also begun to act against the threats posed by spyware. On July 27,

22  2022, the Chair of the U.S. House Permanent Select Committee on Intelligence called the

23  widespread availability of spyware like Pegasus a "game-changer for autocratic regimes that are

24  looking for new means to surveil, intimidate, imprison, or even kill dissidents, journalists, and

25  others who they view as a threat." The Committee subsequently approved legislation that would

26  empower the Director of National Intelligence to prohibit the U.S. intelligence community from

27  buying and using foreign spyware, and that would authorize the President to impose sanctions on

28  foreign firms and individuals that sell, purchase, or use spyware.

52.     Digital security researchers and human rights advocates have also expressed increasing alarm about the implications of spyware for privacy, free speech, and other human rights. Ronald Deibert, Director of the Citizen Lab, has warned that "[a]dvanced spyware is to surveillance [what] nuclear technology is to weapons—it represents a quantum leap forward in sophistication and power." David Kaye, former UN Special Rapporteur on freedom of expression and opinion, has explained that "spyware with the characteristics of Pegasus—the capability to access one's entire device and data connected to it, without discrimination, and without constraint—*already* violates . . . international human rights law," concluding that "[n]o government should have such a tool, and no private company should be able to sell such a tool to governments or others." Dr. Agnès Callamard, Secretary General of Amnesty International and former UN Special Rapporteur on extrajudicial, summary or arbitrary executions, has explained that "[w]e are witnessing a global spyware crisis in which activists, journalists and lawyers are targeted with invasive surveillance as a means to silence and intimidate them."

### *The Pegasus Attacks on El Faro*

53.     Between June 2020 and November 2021, Defendants and their clients surreptitiously installed Pegasus on the devices of at least thirty-five individuals working in and around El Salvador. These Pegasus attacks targeted independent journalists and media organizations, as well as leaders of prominent civil society organizations.

54.     No organization was more profoundly impacted by the Pegasus attacks than El Faro. A digital newspaper based in El Salvador, El Faro is one of the foremost sources of independent journalism in Central America. It is dedicated to investigative and in-depth reporting on issues including corruption, violence, organized crime, migration, inequality, and human rights. Since its founding in 1998, it has become a regional benchmark for independent, transparent, and reliable journalism. Defendants and their clients subjected at least twenty-two of El Faro's thirty-five employees to repeated Pegasus attacks. These attacks went undetected at first, but subsequent analyses identified 226 Pegasus infections between June 2020 and November 2021 on devices used by El Faro employees. The attacks—which intensified around El Faro's publication of major

stories—damaged devices used by employees for both professional and personal purposes and resulted in the exfiltration of sensitive data.

55.    For example, beginning in or around June 2020, Defendants and their clients hacked the device of Plaintiff Carlos Martínez, an El Faro reporter, at least twenty-eight times. The Citizen Lab was able to detect an additional, unsuccessful attempted hack of Mr. Martínez's device using Defendants' FORCEDENTRY exploit on November 15, 2021. During this time, Mr. Martínez was the lead El Faro reporter investigating the secret negotiations between the Salvadoran government and the MS-13 gang.

56.    Between September and November 2020, as El Faro first reported on the MS-13 negotiations, Defendants and their clients hacked the devices of El Faro's employees more than two dozen times. Those whose devices were infected with Pegasus during this time include Plaintiffs Carlos Dada, Sergio Arauz, Gabriel Labrador, Carlos López Salamanca, Carlos Martínez, Óscar Martínez, Daniel Reyes Martínez, Mauricio Sandoval Soriano, and José Luis Sanz.

57.    Defendants and their clients continued to hack El Faro employees' devices throughout the end of 2020 and beginning of 2021, most frequently targeting Carlos Dada, Carlos Martínez, Óscar Martínez, and José Luis Sanz.

58.    The Pegasus attacks increased in intensity. In April and May 2021, Defendants and their clients hacked the devices of El Faro employees fifty-two times. They installed Pegasus on the device of Plaintiff Efren Lemus as he reported that El Salvador's former Minister of Security and Justice had been fired in part because he attempted to mount his own presidential candidacy without President Bukele's support. At the same time, Defendants and their clients hacked the device of Gabriel Labrador while he was conducting interviews for a magazine profile of President Bukele, and they hacked the device Plaintiff Nelson Rauda Zablah while he was covering the trial of sixteen military officers accused of leading the December 1981 massacre of more than one thousand civilians in the village of El Mozote.

59.    Overall, the Pegasus attacks on El Faro employees extended for eighteen months. A list of the known attacks against individuals in El Salvador, including Plaintiffs and other El

Faro employees, can be found in the Citizen Lab report summarizing the attacks, incorporated herein and attached hereto as Exhibit A.

60.     Because Defendants intentionally designed Pegasus to avoid detection, El Faro and its employees were unaware during most of the time they were under attack that their devices had been compromised. El Faro's leadership learned of the first confirmed Pegasus attacks in October 2021, after the Citizen Lab, with the assistance of Access Now, detected evidence of Pegasus on the personal device of Plaintiff Julia Gavarrete. Upon receiving confirmation that her device had been infected with Pegasus, Ms. Gavarrete informed El Faro's leadership of the attack.

61.     El Faro's leadership devoted considerable time and resources to identifying the full extent of the attacks and remediating the harms caused by them. The team—including Carlos Dada, Julia Gavarrete, Daniel Reyes Martínez, and Óscar Martínez—initially submitted forensic data from eleven devices used by El Faro employees for further analysis by the Citizen Lab, with the assistance of Access Now. After the Citizen Lab confirmed that all eleven devices had been infected with Pegasus, the team reached out to additional employees at risk of infection and submitted forensic data from thirty devices for analysis by December 2021. During that time and the months that followed, El Faro employees devoted hundreds of hours to investigating the attacks, identifying other employees who had been targeted, working with security researchers to confirm the nature and duration of the attacks, developing and implementing new digital security policies, and upgrading El Faro's information technology systems. As a result of the attacks, El Faro incurred significant costs that far exceeded $5,000 within the year after El Faro's leadership learned of the attacks.

62.     The Pegasus attacks undermined El Faro's ability to operate, to support its employees, and to serve its readers. The attacks have diverted El Faro leadership and employees from reporting, editing, and publishing. Despite El Faro's best efforts, the attacks have deterred some sources from continuing to communicate with El Faro reporters, deterred some writers from publishing their work with El Faro, and deterred some advertisers from doing business with El Faro.

1

### The Pegasus Attacks on Plaintiffs

2      63.    The Pegasus attacks on devices used by Plaintiffs were part of a coordinated and

3   sustained effort to undermine independent journalism in El Salvador. The attacks all unfolded in a

4   similar manner, beginning with the deployment by Defendants and their clients of zero-click

5   exploits to each targeted device. And the attacks caused similar damage to each device,

6   compromising data stored on and accessible through it. The attacks disabled certain Apple iOS

7   features on the devices, infected the devices with Pegasus, enabled Defendants and their clients to

8   issue commands to the devices without Plaintiffs' knowledge or consent, and undermined the value

9   of the devices for private communication and computing. Although Defendants designed Pegasus

10  to leave no evidence of attempts to exfiltrate data from targeted devices, the Citizen Lab's analyses

11  confirmed exfiltration of data from at least twelve of the devices targeted in the attacks against El

12  Faro, including those used by Plaintiffs Sergio Arauz, Julia Gavarrete, Roman Gressier, Gabriel

13  Labrador, Efren Lemus, Daniel Lizárraga, Carlos López Salamanca, Óscar Martínez, María Luz

14  Nóchez, Mauricio Sandoval Soriano, and José Luis Sanz. On information and belief, Defendants

15  and their clients exfiltrated data from all of Plaintiffs' targeted devices, including data stored on

16  Plaintiffs' cloud-based accounts.

17      64.    **Carlos Dada:** Carlos Dada is the co-founder and director of El Faro. His reporting

18  focuses on corruption and violence.

19      65.    Defendants and their clients hacked Mr. Dada's device, an iPhone 11 owned by El

20  Faro, at least twelve times between July 2020 and June 2021.

21      66.    During the relevant time period, Mr. Dada used his device, which was password-

22  protected, extensively for both personal and professional purposes. His device contained social

23  media and messaging applications, including Facebook, Instagram, Signal, Telegram, Twitter, and

24  WhatsApp. He used the device for communicating with family, friends, sources, and colleagues;

25  for conducting online banking, planning travel, arranging transportation through ride-sharing apps,

26  and consulting maps; and for storing videos and photos. He also used his device to communicate

27  with sources, to store confidential and leaked documents, and to edit work-related documents and

28  drafts in Google Drive. His device was connected to an iCloud account.

67.    The Pegasus attacks caused Mr. Dada substantial harms. He has had to significantly alter how he uses his device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of Mr. Dada's device. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent approximately one hundred hours helping to lead El Faro's initial investigation into the attacks.

68.    **Sergio Arauz:** Sergio Arauz is the deputy editor-in-chief of El Faro and has worked at the organization for twenty-two years. His reporting focuses on politics and human rights.

69.    Defendants and their clients hacked Mr. Arauz's device, an iPhone 11 owned by El Faro, at least fourteen times between August 2020 and October 2021. The Citizen Lab confirmed that data was exfiltrated from Mr. Arauz's device in the course of these attacks, but it could not identify which data was stolen.

70.    During the relevant time period, Mr. Arauz used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Facebook, Gmail, Instagram, Signal, Telegram, Twitter, and WhatsApp. He used the device to communicate with family and friends; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive.

71.    The Pegasus attacks caused Mr. Arauz substantial harms. He has had to significantly alter how he uses his device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes greatly diminished the value of Mr. Arauz's device, which he later replaced. He has suffered, and continues to suffer, mental anguish as a result of the attacks and the loss of his privacy. Finally, he incurred significant costs in investigating and remediating the attacks. For example, as a leader of El Faro and a member of El Faro's Board of Directors, he spent approximately two hundred hours investigating and remediating the attacks against the organization, including by participating in discussions about the impact of the attacks on El Faro and the safety of its employees. He also spent more than two

dozen hours investigating the scope of the attacks against his own device, including by reviewing his notes, project timelines, and reporting topics over the course of the attacks, by attending meetings regarding the forensic analysis of El Faro employees' devices, and by preparing a back-up of his own device for forensic analysis.

72. **Gabriela Cáceres Gutiérrez:** Gabriela Cáceres Gutiérrez is a reporter for El Faro. In 2021, she, along with Plaintiffs Carlos Martínez and Óscar Martínez, published one of El Faro's most significant investigations, revealing secret negotiations held in maximum security prisons between the Bukele Administration and incarcerated members of El Salvador's three main gangs: MS-13, Barrio 18 Revolucionarios, and Barrio 18 Sureños.

73. Defendants and their clients hacked Ms. Cáceres Gutiérrez's device, an iPhone 11 owned by El Faro, at least thirteen times between April and September 2021. These dates coincided with her investigation into the Bukele Administration's negotiations with Salvadoran gangs.

74. During the relevant time period, Ms. Cáceres Gutiérrez used her device, which was password-protected, extensively for both personal and professional purposes. Her device contained social media and messaging applications, including Instagram, Signal, Twitter, and WhatsApp. She used the device to communicate with family and friends; to store personal financial information; and to conduct her work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. Her device was connected to an iCloud account.

75. The Pegasus attacks caused Ms. Cáceres Gutiérrez substantial harms. She has had to significantly alter how she uses her device, diminishing its value to her. She has suffered, and continues to suffer, mental anguish as a result of the attacks. Finally, she incurred significant costs in investigating and remediating the attacks. For example, she spent approximately three weeks investigating the attacks and informing family, friends, and sources that their information had been exposed to Defendants and their clients. She also purchased a new iPhone to protect her sources following the attacks.

76.     **Julia Gavarrete:** Julia Gavarrete joined El Faro's newsroom in 2021. Her reporting focuses on vulnerable communities in Central America, on women's rights, and on environmental issues.

77.     Defendants and their clients hacked Ms. Gavarrete's personal device, an iPhone 11, as well as an El Faro–owned iPhone that she used for work, at least eighteen times between February and September 2021. At one point in 2021, after Ms. Gavarrete scheduled a meeting with a source using her device, military officers arrived at the meeting location at the scheduled time and prevented Ms. Gavarrete and her source from entering a building. The Citizen Lab confirmed that data was exfiltrated from Ms. Gavarrete's personal device in the course of these attacks, but it could not identify which data was stolen.

78.     During the relevant time period, Ms. Gavarrete used her devices, both of which were password-protected, extensively. Her personal device contained social media and messaging applications, including Facebook, Instagram, Signal, Telegram, Twitter, and WhatsApp. She also used her personal device for emailing, conducting personal banking, storing photos of family and friends, sharing sensitive information about her father's failing health with family members and doctors, and monitoring footage from her home security camera. Her work device contained her work email, draft articles that were stored in Google Drive, photos of leaked documents that were stored on Google Photos, and work-related communications. She also used her work device to draft interview notes from anonymous sources. Both of her devices were connected to iCloud accounts.

79.     The Pegasus attacks caused Ms. Gavarrete substantial harms. She has had to significantly alter how she uses both her personal and work devices, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of Ms. Gavarrete's devices. She has also suffered, and continues to suffer, mental anguish and physical symptoms as a result of the attacks, including back pain and eye strain. Finally, she incurred significant costs in investigating and remediating the attacks. For example, she spent a month assisting in El Faro's investigation into the attacks, including by working with the Citizen Lab and Access Now, by meeting with El Faro's leaders and other

1   journalists to ascertain whether their devices had been attacked, and by informing her sources that

2   their information had been exposed to Defendants and their clients. She also purchased an external

3   hard drive so she could prepare back-ups of her devices for forensic analysis by the Citizen Lab,

4   with the assistance of Access Now.

5       80.   **Roman Gressier:** Roman Gressier is a reporter for El Faro. He writes El Faro's

6   English-language newsletter and has reported extensively on Central American politics, human

7   rights, and press freedom.

8       81.   Defendants and their clients hacked Mr. Gressier's device, an iPhone 11 owned by

9   El Faro, at least four times between May and June 2021. The Citizen Lab confirmed that data was

10  exfiltrated from Mr. Gressier's device in the course of these attacks, but it could not identify which

11  data was stolen.

12      82.   During the relevant time period, Mr. Gressier used his device, which was password-

13  protected, extensively for both personal and professional purposes. His device contained social

14  media and messaging applications, including Facebook, Facebook Messenger, Gmail, Instagram,

15  ProtonMail, Signal, and WhatsApp. He used the device to communicate with family and friends;

16  to store personal financial information and passwords; and to conduct his work as a journalist,

17  including by communicating with anonymous sources and editing work-related documents and

18  drafts in Google Drive. His device was connected to an iCloud account.

19      83.   The Pegasus attacks caused Mr. Gressier substantial harms. He has had to

20  significantly alter how he uses his device, including by minimizing work-related communications

21  and prioritizing in-person meetings. These necessary changes have greatly diminished the value

22  of Mr. Gressier's device. He has suffered, and continues to suffer, mental anguish as a result of

23  the attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For

24  example, he spent approximately sixty to seventy hours investigating the attacks, notifying

25  contacts that their information had been exposed to Defendants and their clients, and attempting

26  to remediate the attacks by improving his digital security.

27      84.   **Gabriel Labrador:** Gabriel Labrador is a reporter for El Faro. He has reported

28  extensively on criminal justice and public corruption, including on a Salvadoran Supreme Court

magistrate's ties to the MS-13 gang, on the political and policymaking roles of President Bukele's brothers, and on detentions during El Salvador's recent state of exception.

85.     Defendants and their clients hacked Mr. Labrador's device, an iPhone 11 owned by El Faro, at least twenty times between August 2020 and November 2021. The Citizen Lab confirmed that data was exfiltrated from Mr. Labrador's device in the course of these attacks, but it could not identify which data was stolen.

86.     During the relevant time period, Mr. Labrador used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Facebook, Facebook Messenger, Gmail, Google Hangouts, Google Meet, Instagram, Jitsi Meet, Snapchat, Skype, Telegram, Twitter, WhatsApp, and Zoom. He used the device to communicate with family and friends; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. His device was connected to iCloud and Dropbox accounts.

87.     The Pegasus attacks caused Mr. Labrador substantial harms. He has had to significantly alter how he uses his device, including by minimizing communications with his sources. These necessary changes have greatly diminished the value of Mr. Labrador's device. He has suffered, and continues to suffer, mental anguish as a result of the attacks, and he has seen a therapist to help him manage this stress. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent approximately twenty-four hours describing what he was working on when his device was infected with Pegasus. He spent approximately four hours attending meetings at El Faro about digital security in the wake of the attacks. He also purchased additional security software for his devices.

88.     **Ana Beatriz Lazo Escobar:** Ana Beatriz Lazo Escobar is a marketing manager for El Faro, where she has worked for seven years.

89.     Defendants and their clients hacked Ms. Lazo Escobar's device, an iPhone 11 owned by El Faro, at least once, in April 2021.

90.     During the relevant time period, Ms. Lazo Escobar used her device, which was password-protected, extensively for both personal and professional purposes. Her device contained social media and messaging applications, including Gmail, Instagram, Signal, Telegram, Twitter, and WhatsApp. She also stored personal financial information on the device. Her device was connected to an iCloud account.

91.     The Pegasus attack caused Ms. Lazo Escobar substantial harms. She has suffered, and continues to suffer, mental anguish as a result of the attacks, and she has seen a therapist to help her manage this stress. Finally, she incurred significant costs in investigating and remediating the attacks. For example, she spent approximately eight hours addressing the attacks, including by preparing a back-up of her device for forensic analysis.

92.     **Efren Lemus:** Efren Lemus is a reporter for El Faro. His reporting focuses on gang violence and El Salvador's attempts to curtail it, as well as wrongdoing and corruption within the governing Nuevas Ideas party.

93.     Defendants and their clients hacked Mr. Lemus's device, an iPhone 11 owned by El Faro, at least ten times between April and September 2021. The device was first infected with Pegasus on April 23, 2021, the day Mr. Lemus first received it from El Faro. Defendants and their clients hacked his device at least nine more times over the following five months. The Citizen Lab confirmed that data was exfiltrated from Mr. Lemus's device in the course of these attacks, but it could not identify which data was stolen.

94.     During the relevant time period, Mr. Lemus used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Facebook, Google Meet, Signal, Telegram, Twitter, WhatsApp, and Zoom. He used the device to communicate with family and friends; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. His device was connected to an iCloud account.

95.     The Pegasus attacks caused Mr. Lemus substantial harms. He has had to significantly alter how he uses his device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of Mr. Lemus's device. He has suffered, and continues to suffer, great stress and uncertainty as a result of the attacks, leading him to avoid public places and to alter the route he takes when walking his daughters to school. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent approximately one hundred hours addressing the attacks, including by assisting with El Faro's investigation into the attacks, suspending interviews on reporting projects out of fear of continued surveillance, and notifying sources and contacts that their information had been exposed to Defendants and their clients. He also purchased an external hard drive to prepare a back-up of his device for forensic analysis.

96.     **Daniel Lizárraga:** Daniel Lizárraga worked as the investigations editor for El Faro from January to August 2021. His reporting focuses on corruption.

97.     Defendants and their clients hacked Mr. Lizárraga's device, an iPhone 11 owned by El Faro, at least eight times between April and July 2021. The Citizen Lab confirmed that data was exfiltrated from Mr. Lizárraga's device in the course of these attacks, but it could not identify which data was stolen.

98.     During the relevant time period, Mr. Lizárraga used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Signal, Telegram, Twitter, WhatsApp, and Zoom. He used the device to communicate with family and friends and to conduct his work with El Faro, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. His device was connected to an iCloud account.

99.     The Pegasus attacks caused Mr. Lizárraga substantial harms. He had to significantly alter how he uses his device, including by no longer using it for personal conversations and by minimizing work-related communications. He has suffered, and continues to suffer, mental anguish as a result of the attacks and the loss of his privacy, and he has seen a therapist to help him

1  manage this stress. He has also incurred significant costs in investigating and remediating the

2  attacks. For example, he spent several hours addressing the attacks, including by preparing a back-

3  up of his device for forensic analysis and by notifying contacts and sources that their information

4  had been exposed to Defendants and their clients.

5       100.   **Carlos López Salamanca:** Carlos López Salamanca is the general manager of El

6  Faro.

7       101.   Defendants and their clients hacked Mr. López Salamanca's device, an iPhone 11

8  owned by El Faro, at least three times between September 2020 and May 2021. The Citizen Lab

9  confirmed that data was exfiltrated from Mr. López Salamanca's device in the course of these

10  attacks, but it could not identify which data was stolen.

11       102.   During the relevant time period, Mr. López Salamanca used his device, which was

12  password-protected, extensively for both personal and professional purposes. His device contained

13  social media and messaging applications, including FaceTime, Facebook, Gmail, Instagram,

14  Signal, Telegram, Twitter, and WhatsApp. He used the device to communicate with family and

15  friends; to store personal financial information and photographs; to order food using meal delivery

16  applications; to read the news and watch videos; and to conduct his work with El Faro, including

17  by storing confidential work-related documents in Google Drive. His device was connected to an

18  iCloud account.

19       103.   The Pegasus attacks caused Mr. López Salamanca substantial harms. He has had to

20  significantly alter how he uses his device, including by minimizing work-related communications

21  and removing his work-related email account from his device altogether. These necessary changes

22  greatly diminished the value of Mr. López Salamanca's device. He has suffered, and continues to

23  suffer, mental anguish as a result of the attacks and the loss of his privacy. Finally, he incurred

24  significant costs in investigating and remediating the attacks. For example, he spent approximately

25  forty hours addressing the attacks, including by preparing a back-up of his device for forensic

26  analysis. He spent approximately five additional hours notifying contacts that their information

27  had been exposed to Defendants and their clients.

28

104.   **Carlos Martínez:** Carlos Martínez is a reporter for El Faro. He is a founding member of El Faro's investigative journalism team, and his reporting focuses on gang violence and official misconduct.

105.   Defendants and their clients hacked Mr. Martínez's device, an iPhone 11 owned by El Faro, at least twenty-eight times between June 2020 and October 2021. During many of these months, Mr. Martínez was in regular contact with U.S. Embassy officials as he investigated the Bukele Administration's negotiations with Salvadoran gangs. Although the Citizen Lab could not confirm whether data was exfiltrated from Mr. Martínez's device, one of El Faro's sources played Mr. Martínez's colleague an audio recording of a private conversation Mr. Martínez had with Óscar Martínez during this time.

106.   During the relevant time period, Mr. Martínez used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Facebook, Facebook Messenger, Gmail, Instagram, Signal, Telegram, Twitter, and WhatsApp. He used the device to communicate with family and friends; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. His device was connected to an iCloud account.

107.   The Pegasus attacks caused Mr. Martínez substantial harms. He has had to significantly alter how he uses his device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of his device. He has suffered, and continues to suffer, mental anguish as a result of the attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent approximately five days informing family, friends, and sources that their information had been exposed to Defendants and their clients. He also purchased a new iPhone following the attacks.

108.   **Óscar Martínez:** Óscar Martínez is the editor-in-chief of El Faro. A founding member El Faro's investigative journalism team, he reports on issues of gang violence, migration, and official misconduct.

109.   Defendants and their clients hacked Mr. Martínez's device, an iPhone 8 owned by El Faro, at least forty-two times between July 2020 and October 2021. The Citizen Lab confirmed that data was exfiltrated from Mr. Martínez's device in the course of these attacks. Although the Citizen Lab could not identify which data was stolen from Mr. Martínez's device, one of El Faro's sources played Mr. Martínez's colleague an audio recording of a private conversation Mr. Martínez had with Carlos Martínez during this time.

110.   During the relevant time period, Mr. Martínez used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Gmail, Signal, Telegram, Twitter, and WhatsApp. He used the device to communicate with family and friends; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts.

111.   The Pegasus attacks caused Mr. Martínez substantial harms. He has had to significantly alter how he uses his device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of Mr. Martínez's device. He has suffered, and continues to suffer, mental anguish as a result of the attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent hundreds of hours investigating the attacks, developing El Faro's strategic response to the attacks, establishing new security protocols for El Faro, notifying contacts and sources that their information had been exposed to Defendants and their clients, and improving his own digital security. After the attacks, he started meeting with sources in person more frequently, increasing travel and booking costs. He also purchased at least ten different devices that he used in the months after the attacks were confirmed.

112. **María Luz Nóchez:** María Luz Nóchez is a reporter and the Opinion editor for El Faro. She reports on arts and culture, violence against women and the LGBTQ community, and the rights of Indigenous people.

113. Defendants and their clients hacked Ms. Nóchez's device, an iPhone 11 owned by El Faro, at least three times between February and June 2021. The Citizen Lab confirmed that data was exfiltrated from Ms. Nóchez's device in the course of these attacks, but it could not identify which data was stolen.

114. During the relevant time period, Ms. Nóchez used her device, which was password-protected, extensively for both personal and professional purposes. Her device contained social media and messaging applications, including FaceTime, Facebook Messenger, Gmail, Signal, Telegram, WhatsApp, and Zoom. She used the device to communicate with family and friends; to store personal financial information; and to conduct her work as a journalist, including by editing work-related documents and drafts in Google Drive. Her device was connected to an iCloud account.

115. The Pegasus attacks caused Ms. Nóchez substantial harms. She has had to significantly alter how she uses her device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of her device. She has also suffered, and continues to suffer, mental anguish and physical symptoms as a result of the attacks, including intense abdominal pain. She has seen a therapist to help her manage the stress resulting from the attacks. Finally, she incurred significant costs in investigating and remediating the attacks. For example, she spent several hours addressing the attacks, including by attending meetings at El Faro regarding the investigation into the attacks, preparing a back-up of her device for forensic analysis, and attending additional meetings about digital security following the attacks.

116. **Víctor Peña:** Víctor Peña is a photojournalist for El Faro. He contributes photography and audiovisual and graphic material to El Faro, focusing on issues relating to women's rights, inequality, pollution, and migration.

117.     Defendants and their clients hacked Mr. Peña's device, an iPhone 11 owned by El Faro, at least once, on November 22, 2021. The attack on Mr. Peña's device was the last known Pegasus attack on El Faro.

118.     During the relevant time period, Mr. Peña used his device, which was password-protected, extensively for personal and professional purposes. His device contained social media and messaging applications, including Facebook, Gmail, Instagram, Signal, Telegram, Twitter, and WhatsApp. He used the device to communicate with family and friends; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. His device was connected to an iCloud account.

119.     The Pegasus attack caused Mr. Peña substantial harms. He has had to significantly alter how he uses his device, including by minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of Mr. Peña's device. He has also suffered, and continues to suffer, mental anguish as a result of the attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent approximately one month addressing the attacks, including by assisting with El Faro's investigation into the attacks and by notifying sources and contacts that their information had been exposed to Defendants and their clients.

120.     **Nelson Rauda Zablah:** Nelson Rauda Zablah worked as a reporter and hosted a twice-weekly radio show for El Faro from 2015 to August 2022. He has a decade of experience covering corruption, crime, the justice system, politics, migration, and human rights.

121.     Defendants and their clients hacked Mr. Rauda Zablah's device, an iPhone 11 owned by El Faro, at least six times between April and September 2021. The attacks against Mr. Rauda Zablah's device coincided with three dates on which he visited the U.S. Embassy in San Salvador.

122.     During the relevant time period, Mr. Rauda Zablah used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Facebook, Gmail, Google Meet, Instagram,

Microsoft Teams, Skype, Telegram, TikTok, Twitter, WhatsApp, and Zoom. He used the device to communicate with family and friends, including receiving photos of his nieces and nephews; to store personal financial information; and to conduct his work as a journalist, including by communicating with anonymous sources, storing confidential and leaked documents, and editing work-related documents and drafts in Google Drive. His device was also connected to an iCloud account.

123.    The Pegasus attacks caused Mr. Rauda Zablah substantial harms. He has had to significantly alter how he uses his device, including by no longer using it for personal communication or banking. Similarly, he began minimizing work-related communications and prioritizing in-person meetings. These necessary changes have greatly diminished the value of Mr. Rauda Zablah's device. He has suffered, and continues to suffer, mental anguish as a result of the attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For example, he spent approximately seventy hours assisting El Faro's investigation into the attacks, notifying contacts that their information had been exposed to Defendants and their clients, and taking remedial digital security measures. He spent approximately ten additional hours preparing a back-up of his device for forensic analysis, consulting with information technology experts, deleting and re-downloading the applications he had previously used, and conducting additional security analyses to check for any subsequent reinfection. After moving to the United States, he purchased a new, more secure device with a new number and cellular plan as a result of the attacks. Fearing that the new device may also be targeted, however, he does not use it for tasks that he routinely carried out on his previous device before the attacks.

124.    **Daniel Reyes Martínez:** Daniel Reyes Martínez is the chief technology officer of El Faro.

125.    Defendants and their clients hacked Mr. Reyes Martínez's device, an iPhone 11 owned by El Faro, at least twice between October 2020 and November 2021.

126.    During the relevant time period, Mr. Reyes Martínez used his device, which was password-protected, extensively for both personal and professional purposes. His device contained social media and messaging applications, including Telegram and WhatsApp. He used the device

1   to communicate with family and friends; to store personal financial information; and to conduct

2   his work with El Faro, including by storing work-related documents and drafts in Google Drive.

3   His device was connected to an iCloud account.

4        127.    The Pegasus attacks caused Mr. Reyes Martínez substantial harms. He has had to

5   significantly alter how he uses his device, including by minimizing work-related communications

6   and avoiding phone calls. These necessary changes greatly diminished the value of Mr. Reyes

7   Martínez's device. He has suffered, and continues to suffer, mental anguish as a result of the

8   attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For

9   example, as chief technology officer of El Faro, he spent several months working full time to

10   investigate and assess the extent of the Pegasus attacks. He also spent several hours investigating

11   the scope of the attacks against his own device, including by purchasing a hard drive to prepare a

12   back-up of his device for forensic analysis and by analyzing his device himself using a mobile

13   verification toolkit created by Amnesty International. He also purchased a new device following

14   the attacks in an attempt to ensure better digital security. Experiencing significant stress and

15   uncertainty about the surveillance of his family as a result of the attacks, he also purchased security

16   cameras and a smart doorbell for his home.

17        128.    **Mauricio Ernesto Sandoval Soriano:** Mauricio Ernesto Sandoval Soriano is the

18   general administrator of El Faro.

19        129.    Defendants and their clients hacked Mr. Sandoval Soriano's device, an iPhone 11

20   owned by El Faro, at least four times between August 2020 and October 2021. The Citizen Lab

21   confirmed that data was exfiltrated from Mr. Sandoval Soriano's device in the course of these

22   attacks, but it could not identify which data was stolen.

23        130.    During the relevant time period, Mr. Sandoval Soriano used his device, which was

24   password-protected, extensively for work and occasionally for personal purposes. His device

25   contained social media and messaging applications, including Gmail, Signal, Telegram, Twitter,

26   and WhatsApp. He used his device to conduct his work, including by editing and signing

27   documents in DocuSign and Google Drive and storing documents relating to El Faro's

28

1 administrative, financial, and strategic decisions; he also occasionally used his device for personal

2 purposes, including to communicate with his wife and to share photographs.

3       131.   The Pegasus attacks caused Mr. Sandoval Soriano substantial harms. He has had to

4 significantly alter how he uses his device, including by minimizing work-related communications

5 and prioritizing in-person meetings. These necessary changes have greatly diminished the value

6 of Mr. Sandoval Soriano's device. He has also suffered, and continues to suffer, mental anguish

7 as a result of the attacks. Finally, he incurred significant costs in investigating and remediating the

8 attacks. For example, he spent approximately fifty hours addressing the attacks, including by

9 assisting with El Faro's investigation into the attacks. Experiencing significant stress and

10 uncertainty about the surveillance of his family as a result of the attacks, he also purchased security

11 cameras for his home.

12       132.   **José Luis Sanz:** José Luis Sanz is the Washington correspondent for El Faro. Mr.

13 Sanz reports on human rights, migration, and corruption. A founding member of El Faro's

14 investigative journalism team, he previously reported on issues of violence, gangs, and organized

15 crime in Central America.

16       133.   Defendants and their clients hacked Mr. Sanz's device, an iPhone 8, at least thirteen

17 times between July and December 2020. During these months, Mr. Sanz communicated and

18 attended meetings with U.S. Embassy officials, as well as diplomatic representatives from the

19 European Union, France, Spain, and the United Kingdom. The Citizen Lab confirmed that data

20 was exfiltrated from Mr. Sanz's device in the course of these attacks, but it could not identify

21 which data was stolen.

22       134.   During the relevant time period, Mr. Sanz used his device, which was password-

23 protected, extensively for both personal and professional purposes. His device contained social

24 media and messaging applications, including Facebook, Gmail, Instagram, Signal, Skype,

25 Telegram, Twitter, and WhatsApp. He used the device to communicate with family and friends;

26 to store photographs; to store personal financial information; and to conduct his work as a

27 journalist, including by maintaining the contact information of anonymous sources and editing

28

1 work-related documents and drafts in Google Drive. His device was also connected to an iCloud

2 account.

3   135. The Pegasus attacks caused Mr. Sanz substantial harms. He has had to significantly

4 alter how he uses his device, including by minimizing work-related communications and

5 prioritizing in-person meetings. These necessary changes have greatly diminished the value of Mr.

6 Sanz's device. He has also suffered, and continues to suffer, mental anguish as a result of the

7 attacks. Finally, he incurred significant costs in investigating and remediating the attacks. For

8 example, he spent approximately eighty hours assisting El Faro's investigation into the attacks and

9 taking remedial digital security measures. He spent approximately four to five additional hours

10 notifying contacts and sources that their information had been exposed to Defendants and their

11 clients.

12   136. Overall, the Pegasus attacks caused Plaintiffs serious economic, reputational,

13 professional, psychological, and personal harms, and caused Plaintiffs and El Faro significant

14 losses aggregating over $5,000 within the year after they learned of the attacks. The attacks have

15 also undermined Plaintiffs' ability to serve as sources of independent journalism in El Salvador

16 and Central America.

17           **CAUSES OF ACTION**

18             **Count I**
      **Violations of the Computer Fraud and Abuse Act**

19           **18 U.S.C. § 1030**

20   137. As explained above, between June 2020 and November 2021, Defendants

21 repeatedly accessed Plaintiffs' devices, including their cloud-based accounts, without

22 authorization. Each Plaintiff either owned a device targeted in the Pegasus attacks or had a

23 possessory interest in and exclusive right to use a targeted device in connection with their

24 employment with El Faro. These devices also contained Plaintiffs' private information, including

25 private communications, photographs, and writings. The devices are "protected computers" within

26 the meaning of 18 U.S.C. § 1030(e)(2)(B) because they are "used in or affecting interstate or

27 foreign commerce or communication."

28

138.     Plaintiffs suffered both damage and loss as a result of the Pegasus attacks on their devices.

139.     The total losses stemming from the Pegasus attacks—including costs incurred by Plaintiffs as well as those incurred by El Faro—exceeded $5,000 in aggregate during a one-year period.

140.     The Pegasus attacks damaged the devices used and/or owned by Plaintiffs. For example, the attacks disabled certain Apple iOS features on the devices, infected the devices with spyware, and enabled Defendants and their clients to issue commands to the devices without Plaintiffs' knowledge or consent—all of which also made the devices less valuable to Plaintiffs as tools for private communication and computing.

<u>18 U.S.C. § 1030(a)(2)(C)</u>

141.     Defendants violated 18 U.S.C. § 1030(a)(2)(C) because they intentionally accessed and/or caused to be accessed Plaintiffs' devices without authorization and obtained information from those devices.

142.     Defendants accessed and/or caused to be accessed Plaintiffs' devices without authorization through attacks that enabled the surreptitious installation of Pegasus on Plaintiffs' devices.

143.     Defendants infected Plaintiffs' devices with Pegasus to enable real-time surveillance of those devices and to exfiltrate data from those devices to Defendants and their clients. Once installed, Pegasus provided Defendants and their clients with essentially unlimited access to Plaintiffs' devices, allowing them to remotely surveil and exfiltrate data stored on those devices and on the cloud-based accounts connected to those devices.

144.     Although Pegasus attacks are designed to leave no trace, analysis by the Citizen Lab confirmed that data was obtained from at least eleven devices used and/or owned by Plaintiffs. On information and belief, Defendants and their clients obtained data from all of Plaintiffs' targeted devices, including by accessing data stored on Plaintiffs' cloud-based accounts.

1

18 U.S.C. § 1030(a)(5)

2     145.    Defendants violated 18 U.S.C. § 1030(a)(5)(A) because they knowingly caused the

3 transmission of a program, information, code, or command to Plaintiffs' devices and, as a result,

4 intentionally damaged those devices without authorization.

5     146.    Defendants violated 18 U.S.C. § 1030(a)(5)(B) because they intentionally accessed

6 Plaintiffs' devices without authorization and, as a result, recklessly caused damage.

7     147.    Defendants violated 18 U.S.C. § 1030(a)(5)(C) because they intentionally accessed

8 Plaintiffs' devices without authorization and, as a result, caused damage and loss.

9

18 U.S.C. § 1030(b)

10     148.    Defendants violated 18 U.S.C. § 1030(b) by conspiring and attempting to commit

11 the violations alleged in the preceding paragraphs.

12     149.    In the alternative, Defendants knowingly and intentionally aided and abetted their

13 clients in the violations of 18 U.S.C. § 1030 alleged in the preceding paragraphs.

14

**Count II**
**Violations of the California Comprehensive Computer Data Access and Fraud Act**

15

**California Penal Code § 502**

16     150.    Each Plaintiff either owned a device targeted in the Pegasus attacks or had a

17 possessory interest in and exclusive right to use a targeted device in connection with their

18 employment with El Faro. These devices also contained Plaintiffs' private information, including

19 private communications, photographs, and writings.

20     151.    Defendants violated California Penal Code § 502(c)(1) by knowingly and without

21 permission accessing Plaintiffs' devices and altering, damaging, or using those devices in order to

22 wrongfully control the devices and obtain data from them. Analysis by the Citizen Lab confirmed

23 that data was obtained from at least eleven of Plaintiffs' devices. On information and belief,

24 Defendants and their clients obtained data from all of Plaintiffs' targeted devices, including by

25 accessing information stored on Plaintiffs' cloud-based accounts.

26     152.    Defendants violated California Penal Code § 502(c)(2) by knowingly accessing and

27 without permission taking, copying, and making use of data from Plaintiffs' devices, including

28 data stored on their cloud-based accounts.

153.    Defendants violated California Penal Code § 502(c)(3) by knowingly accessing and without permission using, or causing to be used, Plaintiffs' computer services. The installation of Pegasus on Plaintiffs' devices required computing and data processing by the targeted devices without Plaintiffs' knowledge or consent. The installation and maintenance of Pegasus on Plaintiffs' devices relied on and exploited the devices' storage functions without Plaintiffs' knowledge or consent. The exfiltration of data from Plaintiffs' devices resulted from Pegasus issuing commands to the devices and controlling their computing functions without Plaintiffs' knowledge or consent.

154.    Defendants violated California Penal Code § 502(c)(4) by knowingly accessing and without permission adding and altering data, software, and computer programs on Plaintiffs' devices. Defendants altered the functioning of Plaintiffs' devices by infecting them with malicious data, software, and computer programs without Plaintiffs' permission.

155.    Defendants violated California Penal Code § 502(c)(6) by knowingly providing a means of accessing Plaintiffs' devices and cloud-based accounts in violation of the California Computer Data Access and Fraud Act.

156.    Defendants violated California Penal Code § 502(c)(7) by knowingly and without permission accessing and causing to be accessed Plaintiffs' devices and cloud-based accounts.

157.    Defendants violated California Penal Code § 502(c)(8) by knowingly introducing a computer contaminant onto Plaintiffs' devices.

158.    In carrying out the attacks on Plaintiffs' devices, Defendants acted oppressively, fraudulently, and maliciously.

**Count III**
**Trespass to Chattels**

159.    Each Plaintiff either owned a device targeted in the Pegasus attacks or had a possessory interest in and exclusive right to use a targeted device in connection with their employment with El Faro. These devices also contained Plaintiffs' private information, including private communications, photographs, and writings.

160.    Through the Pegasus attacks, Defendants intentionally and without authorization interfered with Plaintiffs' possessory interest in the targeted devices and in the information stored on and accessible through those devices.

161.    Through the Pegasus attacks, Defendants intentionally and without authorization damaged the devices used and/or owned by Plaintiffs. For example, the attacks disabled certain Apple iOS features on the devices, infected the devices with spyware, and enabled Defendants and their clients to issue commands to the devices without Plaintiffs' consent—all of which also made the devices less valuable to Plaintiffs as tools for private communication and computing.

162.    Defendants caused Plaintiffs to suffer substantial harms, including the degradation in value of the devices themselves, costs incurred in investigating and remediating the attacks, loss of professional goodwill, medical expenses, and emotional distress.

**Count IV**
**Intrusion upon Seclusion**

163.    Each Plaintiff either owned a device targeted in the Pegasus attacks or had a possessory interest in and exclusive right to use a targeted device in connection with their employment with El Faro. Plaintiffs had a reasonable expectation of privacy in these devices. Each device was password-protected and contained private information, including communications, photographs, and writings.

164.    Defendants intentionally intruded into Plaintiffs' private affairs by installing or causing to be installed malicious code on their devices. The installation of Pegasus on Plaintiffs' devices gave Defendants and their clients essentially full control of the devices, including the ability to covertly surveil and extract contact details, text messages, instant messages, notes, emails, web-browsing activity, files, and passwords; to monitor phone calls and VoIP calls, as well as user activity on different applications, including WhatsApp, Facebook, and Skype; to track and log the device's GPS location; to activate the device's microphone to record surrounding sounds; and to activate the device's camera to take photographs. Although Pegasus attacks are designed to leave no trace, the Citizen Lab's analyses confirmed that data was exfiltrated from at least eleven devices used and/or owned by Plaintiffs. On information and belief, Defendants and their clients

1  exfiltrated data from all of Plaintiffs' targeted devices, including by accessing data stored on their
2  cloud-based accounts.

3      165.   Defendants' actions would be highly offensive to the reasonable person.

4      166.   The Pegasus attacks executed by Defendants and their clients caused Plaintiffs to
5  suffer substantial harms, including the degradation in value of the devices themselves, costs
6  incurred in investigating and remediating the attacks, medical expenses, and emotional distress.

7                          **REQUEST FOR RELIEF**

8      Plaintiffs respectfully request that this Court:

9      A.    Declare that Defendants have:

10            i.   Violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

11            ii.  Violated the California Comprehensive Computer Data Access and Fraud Act,
12                 Cal. Penal Code § 502;

13            iii. Trespassed onto Plaintiffs' property in violation of California law; and

14            iv.  Intruded upon Plaintiffs' seclusion in violation of California law.

15     B.    Enter a permanent injunction restraining Defendants from accessing, attempting to
16           access, or assisting others in accessing or attempting to access, Plaintiffs' devices.

17     C.    Enter a permanent injunction requiring Defendants to catalogue all information
18           obtained as a result of the Pegasus attacks on Plaintiffs' devices; to return and then
19           delete all such information in Defendants' possession; to disclose the identities of
20           all persons and/or entities with whom Defendants shared such information, when
21           that information was shared, and under what conditions; and to disclose the
22           identities of all of Defendants' clients who were involved in the attacks on
23           Plaintiffs' devices, including the specific individuals with whom Defendants
24           contracted or coordinated and the specific nature of each individual's involvement.

25     D.    Award Plaintiffs compensatory damages, as permitted by law and in such amounts
26           to be proven at trial.

27     E.    Award Plaintiffs punitive damages, as permitted by law and in such amounts to be
28           proven at trial.

AMENDED COMPLAINT                    38              Case No. 3:22-cv-07513-WHA

1     F.      Award Plaintiffs their reasonable costs and attorneys' fees incurred in this action.

2     G.      Grant such other and further relief as the Court may deem just and proper.

3

4     DATED: December 16, 2022                    Respectfully submitted,

5

6                                                 /s/ Paul Hoffman
                                                  Paul Hoffman #71244
7                                                 John Washington #315991
                                                  Schonbrun, Seplow, Harris,
8                                                   Hoffman & Zeldes LLP
                                                  200 Pier Avenue, Suite 226
9                                                 Hermosa Beach, CA 90254
                                                  T: (424) 297-0114
10                                                F: (310) 399-7040
                                                  hoffpaul@aol.com
11

12                                                /s/ Carrie DeCell
                                                  Carrie DeCell, *Pro Hac Vice*
13                                                Jameel Jaffer, *Pro Hac Vice*
                                                  Alex Abdo, *Pro Hac Vice*
14                                                Stephanie Krent, *Pro Hac Vice*
                                                  Evan Welber Falcón, *Pro Hac Vice*
15                                                Knight First Amendment Institute
                                                    at Columbia University
16                                                475 Riverside Drive, Suite 302
                                                  New York, NY 10115
17                                                T: (646) 745-8500
                                                  F: (646) 661-3361
18                                                carrie.decell@knightcolumbia.org
19

20                                                *Counsel for Carlos Dada, Sergio Arauz,*
                                                    *Gabriela Cáceres Gutiérrez, Julia*
21                                                  *Gavarrete, Roman Gressier, Gabriel*
                                                    *Labrador, Ana Beatriz Lazo Escobar, Efren*
22                                                  *Lemus, Daniel Lizárraga, Carlos López*
                                                    *Salamanca, Carlos Martínez, Óscar*
23                                                  *Martínez, María Luz Nóchez, Víctor Peña,*
                                                    *Nelson Rauda Zablah, Daniel Reyes*
24                                                  *Martínez, Mauricio Sandoval Soriano, and*
                                                    *José Luis Sanz*
25

26

27

28

EXHIBIT A

# Project Torogoz

## Extensive Hacking of Media & Civil Society in El Salvador with Pegasus Spyware

By John Scott-Railton, Bill Marczak, Paolo Nigro Herrero, Bahr Abdul Razzak, Noura Al-Jizawi, Salvatore Solimano, and Ron Deibert

JANUARY 12, 2022
RESEARCH REPORT #148





# Copyright

© Citizen Lab



Licensed under the Creative Commons BY-SA 4.0 (Attribution-ShareAlike licence). Electronic version first published in 2022 by the Citizen Lab. This work can be accessed through https://citizenlab.ca/2022/01/project-toro-goz-extensive-hacking-media-civil-society-el-salvador-pegasus-spyware/.

Document Version: 1.0

The Creative Commons Attribution-ShareAlike 4.0 license under which this report is licensed lets you freely copy, distribute, remix, transform, and build on it, as long as you:

- give appropriate credit;
- indicate whether you made changes; and
- use and link to the same CC BY-SA 4.0 licence.

However, any rights in excerpts reproduced in this report remain with their respective authors; and any rights in brand and product names and associated logos remain with their respective owners. Uses of these that are protected by copyright or trademark rights require the rightsholder's prior written agreement.

# Suggested Citation

John Scott-Railton, Bill Marczak, Paolo Nigro Herrero, Bahr Abdul Razzak, Noura Al-Jizawi, Salvatore Solimano, and Ron Deibert. "Project Torogoz: Extensive Hacking of Media & Civil Society in El Salvador with Pegasus Spyware," Citizen Lab Research Report No. 148, University of Toronto, January 2022.

# Acknowledgements

We thank and acknowledge the many individuals that allowed us to analyze their devices as part of this investigation.

Special thanks to Mohammed Al-Maskati from Frontline Defenders for invaluable assistance.

Special thanks to the staff and incident handlers at the Access Now helpline for their invaluable support to this process and assistance to victims.

Special thanks to all of the organizations participating in this investigative collaboration including SocialTIC and Fundación Acceso.

Thanks to Siena Anstis, Celine Bauwens, Miles Kenyon, Adam Senft, and Mari Zhou for review, copy editing, and publication support.

Special thanks to TNG for invaluable assistance on this project.

# About the Citizen Lab, Munk School of Global Affairs & Public Policy, University of Toronto

**The Citizen Lab** is an interdisciplinary laboratory based at the Munk School of Global Affairs & Public Policy, University of Toronto, focusing on research, development, and high-level strategic policy and legal engagement at the intersection of information and communication technologies, human rights, and global security.

We use a "mixed methods" approach to research that combines methods from political science, law, computer science, and area studies. Our research includes investigating digital espionage against civil society, documenting Internet filtering and other technologies and practices that impact freedom of expression online, analyzing privacy, security, and information controls of popular applications, and examining transparency and accountability mechanisms relevant to the relationship between corporations and state agencies regarding personal data and other surveillance activities.

# Contents

Key Findings                                                                          1

1. Introduction                                                                       1

   Repression and Impunity in El Salvador                                             2
   The Bukele Administration                                                          2
   The State of Police and Private Security Firms                                     3
   Salvadoran Media under Threat                                                      4
   The TOROGOZ Pegasus Operator and El Salvador                                       4

2. Findings: Salvadoran Pegasus Targeting                                            5

   Confirmed Targets                                                                  5
   Zero-Click Exploits                                                                7
   One-Click Links                                                                    7

3. Attribution                                                                        8

4. Conclusion: Mercenary Spyware Continues to Harm Media, Civil Society              9

   Pegasus and the Media                                                             10

Appendix A: Hacking Timeline                                                         10

Proyecto Torogoz: Hackeo extensivo de los medios de comunicación y la sociedad civil en El Salvador con el programa espía Pegasus

# Key Findings

> **The Citizen Lab and Access Now have conducted a joint investigation into Pegasus hacking in El Salvador in collaboration with Frontline Defenders, SocialTIC, and Fundación Acceso.**

> **We confirmed 35 cases of journalists and members of civil society whose phones were successfully infected with NSO's Pegasus spyware between July 2020 and November 2021. We shared a sample of forensic data with Amnesty International's Security Lab which independently confirms the findings.**

> **Targets included journalists at *El Faro*, *GatoEncerrado*, *La Prensa Gráfica*, *Revista Digital Disruptiva*, *Diario El Mundo*, *El Diario de Hoy*, and two independent journalists. Civil society targets included *Fundación DTJ*, *Cristosal*, and another NGO.**

> **The hacking took place while the organizations were reporting on sensitive issues involving the administration of President Bukele, such as a scandal involving the government's negotiation of a "pact" with the MS-13 gang for a reduction in violence and electoral support.**

> **While evidence linking a particular infection to a particular Pegasus customer is often unavailable, in this case we identified a Pegasus customer operating almost exclusively in El Salvador since at least November 2019 that we call TOROGOZ, and have connected this operator to an infection attempt against *El Faro*.**

# 1. Introduction

This report describes the results of a collaborative investigation into the abuse of NSO Group's Pegasus spyware to target members of the press and civil society in El Salvador. The investigation led to the identification of 35 Pegasus-infected individuals (37 devices) among members of El Salvador's media and civil society.

Our investigation began in September 2021 when a group of independent journalists contacted Access Now's Digital Security Helpline after testing their devices using the Amnesty International Security Lab's Mobile Verification Toolkit (MVT) tool to detect Pegasus spyware.

The resulting investigation was a collaboration between the Citizen Lab and Access Now, with investigative assistance and case referrals from Frontline Defenders, SocialTIC, and Fundación Acceso. We asked Amnesty International's Security Lab to conduct an independent review of our analysis for a sample of cases, and they have confirmed our findings.

## Repression and Impunity in El Salvador

Like most central American countries, El Salvador has had a troubled history marked by authoritarianism, endemic civil war and numerous coups, official and clandestine foreign intelligence and military assistance (particularly during the Cold War), organized crime, corruption, and drug trafficking.

Between 1970 and 1992, the country was ravaged by the Salvadoran Civil War, fought between a right-wing military junta and a coalition of left-wing guerilla groups under the umbrella of the Farabundo Martí National Liberation Front (FMLN). The era was characterized by frequent extra-judicial killings, mass disappearances and massacres of civilians, and numerous other human rights abuses, many of which were undertaken by "death squads" (some of whom were reportedly supported and trained by United States military advisors).

This period of violence and authoritarianism left a deep legacy of impunity and a tradition of corruption in El Salvador's armed forces and political establishment. The period also created opportunities for organized crime and corruption, as well as the growth of poorly regulated and unaccountable private security firms.

## The Bukele Administration

El Salvador's current president is the charismatic 40 year old Nayib Bukele, who has been in office since winning the general election in June 2019. Bukele was formerly mayor of Nuevo Cuscatlán (2012-15) and mayor of San Salvador (2015-18). In both cases he represented leftist parties. Although Bukele represents an aesthetic break with the typical Latin American autocrat, and despite his many public denouncements against strongmen, he has shown growing autocratic tendencies.

In February 2020, Bukele entered the legislative assembly accompanied by soldiers and armed guards in an attempt to intimidate lawmakers into approving his platform. In May 2021, Bukele and his supporters in the legislature fired the country's attorney general and several judges, in a move that Bukele described as "cleaning our house." Bukele was elected on a platform that included a plan to reduce the extraordinary violence in the country by encouraging cooperation between the country's armed forces and organized criminal gangs.

Although official murder counts have declined in recent years, a 2021 report by the Foundation of Studies for the Application of Law (Fundación de Estudios para la Aplicación del Derecho, or FESPAD) found that pacts between gangs and state officials, originally intended to lower homicide rates, have instead increased the recurrence of forced disappearances. FESPAD found several unidentified mass graves in areas with the highest gang presence. While forced disappearances allow gangs to execute with impunity, Bukele's administration also undertakes brutal crackdowns against imprisoned gang members across the country.

Unlike many past authoritarians, Bukele blends a particular fluency in social media and dexterity in the use of memes, with the use of large popular public events to capitalize on popular disenchantment with traditional political parties. A recent analysis described Bukele as embodying a new type of "millennial authoritarianism," defined as "a distinctive political strategy that combines traditional populist appeals, classic authoritarian behavior, and a youthful and modern personal brand built primarily via social media."

## The State of Police and Private Security Firms

The policing of gang violence within a context of generalized insecurity in El Salvador warrants special attention. In 2019, President Bukele authorized the intervention of armed forces in police duties, resulting in numerous human rights concerns, as highlighted in a 2020 State Dept. Human Rights report. At present, Salvadorans are concurrently subjected to both gang violence and aggressive, authoritarian policing. The threat of violence has led to unprecedented internal displacement. In 2017 alone, 296,000 Salvadorans were forced to move out of their homes due to the threat of violence.

Approximately 450 private security firms are operating illegally in El Salvador, often due to a failure to obtain or renew proper authorization and paperwork. Salvadoran police claim to be unable to hold these firms accountable. As of 2016, roughly 24,100 private security guards were active in El Salvador, an estimate that dwarfs the number of active police officers.

With private security firms and militia lacking proper oversight, El Salvador's Private Security Services Law does little to solve the problem, as noted by Freedom House. Article 47 of this law indicates that severe offenses attributed to private security services must be sanctioned with a financial penalty on salaries, but the exact nature of the fine is vague. This gap leaves police forces unable to hold private security firms accountable for their conduct. *La Prensa Gráfica* has found that not a single private security firm has been held accountable. Instances where police did come close to sanctioning a firm were later dropped in court.

This lack of accountability is troubling in light of accounts that Mara Salvatrucha (MS-13) gang members have infiltrated private security firms to extort Salvadoran citizens. Indeed, extortion has been on the rise since the Salvadoran government struck a deal with gang leaders. Salvadoran police have also had trouble keeping their own personnel in check. For example, a 2017 *Insight Crime* report shows that while some police officers have been jailed for illegal smuggling of items into jail cells, others, accused of extrajudicial killings, remain free.

## Salvadoran Media under Threat

While there is a lively press in El Salvador, with outlets such as *El Faro* and *Revista Factum* providing regular critical coverage, journalists face numerous challenges in the country.

Reporters Without Borders ranks El Salvador 82nd in its 2021 World Press Freedom Index (an eight-place drop since 2020). Freedom House ranks El Salvador's freedom and independence of media as "partially free" and highlights rampant corruption, censorship, and interventions such as barring access to journalists at homicide scenes. Both *El Faro* and *Revista Factum* have also been frequently barred from accessing government conferences. The Freedom House report also notes verbal attacks directed at the press by Bukele himself. For example, in September 2020, Bukele used two hours of national airtime to denigrate and accuse the media of being his enemies.

Verbal attacks and threats against the press are not limited to Bukele. In September 2021, Javier Argueta, Nayib Bukele's legal counsel, threatened two journalists at *GatoEncerrado* for reporting on a meeting he held with four members of the Salvadoran Supreme Electoral Court. In a Twitter diatribe, Argueta threatened legal action if the journalists did not reveal their sources.

In 2021 alone, the Journalists Association of El Salvador (APES) recorded more than 200 cases of aggression against journalists, ranging from denial of access to harassment. Instances of animosity toward the press have involved state ministers and legislators, as well as executives of El Salvador's Autonomous Executive Port Commission (CEPA), all found to have verbally abused reporters. June and July 2021 press releases from APES denounced abuses by members of the Supreme Court of Justice, Bukele's Office and the Ministry of Security and Justice. In addition, a 165% increase in aggressions against female journalists, recorded last year, also characterizes El Salvador's endemic problem of media repression.

## The TOROGOZ Pegasus Operator and El Salvador

Through our ongoing Internet scanning and DNS cache probing, we identified a Pegasus operator focusing almost exclusively within El Salvador that we named **TOROGOZ**. We first observed this operator in early 2020, though the domain names associated with the operator appear to have been registered as early as November 2019.

In a 2020 report *Running in Circles*, we identified a Salvadoran client of Circles, an NSO Group-affiliated company. The Circles system, which is an entirely separate product and uses different technology than Pegasus, allows its operator to track locations of phones around the world, and to intercept unencrypted SMS messages and phone calls in some cases. Unlike Pegasus, use of the Circles system does not involve hacking target devices, and instead involves attacks against the mobile phone signaling system. The forensic artifacts analyzed in this report have no relationship to Circles technology.

While there is no conclusive technical evidence that **TOROGOZ** represents the Salvadoran government, the strong country-specific focus of the infections suggests that this is very

likely. Additionally, in the single case of hacking in this investigation in which we recovered the domain names of the Pegasus servers used, the **_TOROGOZ_** operator was implicated.

# 2. Findings: Salvadoran Pegasus Targeting

Following the Citizen Lab's research and technical protocols, the Citizen Lab and Access Now obtained forensic artifacts, including logs, from each target's device. With their consent, we analyzed the logs for forensic signatures associated with NSO Group's Pegasus spyware.

We conclude that at least 35 individuals from media organizations _El Faro_, _GatoEncerrado_, _La Prensa Gráfica_, _Revista Digital Disruptiva_, _Diario El Mundo_, _El Diario de Hoy,_ and two independent journalists were hacked with Pegasus. We also identified hacking against civil society organizations in El Salvador, including Fundación DTJ, Cristosal, and another NGO.

The infections described in this report have been identified with high confidence and a sample of the cases have been peer reviewed by Amnesty's Security Lab. Their peer review supports our finding of Pegasus infections.

## Confirmed Targets[1]

Our forensic analysis focuses on determining whether specific processes or binaries linked to NSO Group's Pegasus spyware were running on the phone in question during a specified time. The forensic analysis involves both searching records of execution maintained by the phone, as well as searching for other traces associated with the execution or installation of Pegasus. See **Appendix A** for a full list of dates that exploits were fired at the phones resulting in successful hacking.

Pegasus attempts to delete evidence of its successful exfiltration, so evidence establishing exfiltration may not be available in all cases. This should not be interpreted as suggesting that exfiltration did not take place.

| Target | Affiliation | Forensic Finding |
|---|---|---|
| Noah Bullock | Cristosal | Pegasus infection |
| (Individual #1) | Diario El Mundo | Pegasus infection |
| Ricardo Avelar | El Diario de Hoy | Pegasus infection |
| Ana Beatriz Lazo | El Faro | Pegasus infection |
| Carlos Dada | El Faro | Pegasus infection |
| Carlos Ernesto Martínez D'aubuisson | El Faro | Pegasus infection |
| Daniel Lizárraga | El Faro | Pegasus exfiltration |

---

1    Whereas a number of targets preferred to remain anonymous, the other targets consented to be identified.

| Target | Affiliation | Forensic Finding |
|--------|-------------|------------------|
| Daniel Reyes | El Faro | Pegasus infection |
| Efren Lemus | El Faro | Pegasus exfiltration |
| Gabriel Labrador | El Faro | Pegasus exfiltration |
| Gabriela Cáceres | El Faro | Pegasus infection |
| José Luis Sanz | El Faro | Pegasus exfiltration |
| Julia Gavarrete (Phone #1) | El Faro | Pegasus exfiltration |
| Julia Gavarrete (Phone #2) | El Faro | Pegasus infection |
| María Luz Nóchez | El Faro | Pegasus exfiltration |
| Mauricio Ernesto Sandoval Soriano | El Faro | Pegasus exfiltration |
| Nelson Rauda | El Faro | Pegasus infection |
| Óscar Martínez | El Faro | Pegasus exfiltration |
| Rebeca Monge | El Faro | Pegasus infection |
| Roman Gressier | El Faro | Pegasus exfiltration |
| Roxana Lazo | El Faro | Pegasus exfiltration |
| Sergio Arauz | El Faro | Pegasus exfiltration |
| Valeria Guzmán | El Faro | Pegasus infection |
| Víctor Peña | El Faro | Pegasus infection |
| (Individual #2) | El Faro | Pegasus infection |
| (Individual #3) | El Faro | Pegasus exfiltration |
| Jose Marinero | Fundación DTJ | Pegasus infection |
| Xenia Hernandez | Fundación DTJ | Pegasus infection |
| Beatriz Benitez | GatoEncerrado | Pegasus exfiltration |
| Ezequiel Barrera | GatoEncerrado | Pegasus exfiltration |
| Xenia Oliva (Phone #1) | GatoEncerrado | Pegasus exfiltration |
| Xenia Oliva (Phone #2) | GatoEncerrado | Pegasus exfiltration |
| (Individual #4) | La Prensa Gráfica | Pegasus infection |
| Oscar Luna | Revista Digital Disruptiva | Pegasus infection |
| (Individual #5) | (NGO #1) | Pegasus infection |
| Mariana Belloso | (Independent Journalist) | Pegasus infection |
| Carmen Tatiana Marroquín | (Economist and Columnist for Independent Media) | Pegasus infection |

Table 1: Confirmed individuals hacked with Pegasus Spyware in El Salvador.

Each positive result in this case represents a phone we identified with *high confidence* as successfully hacked with Pegasus spyware (denoted as "Pegasus infection" in **Table 1**). In a subset of the cases, we are able to establish an additional result: successful exfiltration (denoted as "Pegasus exfiltration" in **Table 1**), indicating high confidence that the spyware successfully uploaded data from the phone to Pegasus infrastructure. In several

cases, Pegasus apparently exfiltrated multiple gigabytes of data successfully from target phones using their mobile data connections.

We observed extensive targeting using zero-click exploits, however we also identified specific instances in which targets were sent one-click infection links via SMS message.

## Zero-Click Exploits

We assess that at least two zero-click exploits were deployed against the journalists in El Salvador: **_KISMET_** and **_FORCEDENTRY_**. Thirteen of the phones contained the **_KISMET FACTOR_**, which we believe is an artifact left behind by the execution of NSO Group's zero-click **_KISMET_** exploit. We saw this exploit deployed between July and December 2020, and the exploit appears to have been a zero-day against iOS 13.5.1 and 13.7. The **_KISMET_** exploit has not yet been publicly captured and analyzed, but appeared to involve the use of JPEG attachments, as well as iMessage's _IMTranscoderAgent_ process invoking a WebKit instance.

Additionally, we recovered a copy of the **_FORCEDENTRY_** exploit from one of the phones. The exploit appears to have been fired at a phone with iOS 14.8.1, which is not vulnerable to **_FORCEDENTRY_**. The exploit does not appear to have run on the phone. It is unclear why the exploit was fired at a non-vulnerable iOS version, though it is possible that NSO operators cannot always determine the precise iOS version used by the target before firing an exploit.

We have not identified a long-lived forensic artifact associated with **_FORCEDENTRY_** that can differentiate that exploit from other techniques used to install Pegasus on a phone, but we believe that NSO iPhone hacking between February and November 2021 was generally conducted with the **_FORCEDENTRY_** exploit. **_FORCEDENTRY_** appears to be the same exploit that Amnesty's Security Lab observed traces of in their Pegasus Project analysis, which they refer to as "Megalodon."

## One-Click Links

We fingerprinted Pegasus URL shortener websites and identified 244 domain names registered from 2019 through 2021 that appear to have been used by various NSO Group customers to distribute the Pegasus spyware via links. In the case of a single target at El Faro, we saw one-click SMS messages sent to the target containing links matching our Pegasus fingerprint.

| Date | Original SMS | English Translation |
|------|--------------|---------------------|
| Jul 4, 2020 | Fiscalia tras periodistas del faro. https://info-urbano[.]com/SxUqnKe1 | District attorney's office against journalists from El Faro |

| Date | Original SMS | English Translation |
|------|-------------|---------------------|
| Jul 4, 2020 | Personal de salud denuncia mala administracion del Gobierno https://informados24h[.]com/wNjzhTb | Health staff denounces bad administration by the government |
| Jul 7, 2020 | Presidente sale en defensa de su ahijado politico. https://informados24h[.]com/ZKtywtTbM | The President comes out in defense of his political protégé |
| Jul 8, 2020 | Nuevas Ideas eclipsa a sus oponentes. https://informados24h[.]com/VNCeEmT | Nuevas Ideas [the political party of El Salvador's President] eclipses their opponents |
| Sep 7, 2020[2] | Noticia de El Salvador trasciende a nivel mundial https://informados24h[.]com/nRG9mDx | News from El Salvador goes worldwide |

The messages sent to the target contained links to the following Pegasus domain names:

```
informados24h[.]com  info-urbano[.]com
```

The following four domains that we detected in our Pegasus scanning had similar registration characteristics to the two domains above above and thus may have been used by the same Pegasus customer:

```
mobile-analytics[.]netweb-cloud-services[.]com
```

```
solo-hoy[.]com
```

```
deportes24-7[.]com
```

## Apple Notifications to Confirmed Pegasus Victims

On November 23rd, 2021 Apple began sending notifications to some iPhone users who had been targeted with NSO Group's ***FORCEDENTRY*** exploit. Apple also filed a lawsuit against NSO Group on the same day.

Many of the Pegasus targets that we confirm in this investigation also reported receiving "state-sponsored spyware" notifications from Apple, including twelve journalists at *El Faro*, and two members of *Fundación DTJ*.

# 3. Attribution

At this time Citizen Lab is not conclusively attributing the attacks to a particular government customer of NSO Group, however there is a range of circumstantial evidence pointing to a strong El Salvador government nexus.

---

2    Note that the original SMS contains a double-space between the words "Salvador" and "trasciende"

First, the cases share a troubling nexus with the interests of the Bukele government:

- Targeting coincides with moments that the organizations were working on issues of great interest to the Bukele government

- Targets work focuses on domestic issues, and thus would be most relevant to a domestic audience

Secondly, Citizen Lab network scanning-based evidence has revealed TOROGOZ, an operator whose activities are strongly suggestive of a Pegasus customer in El Salvador. Notably, the operator had a near-total focus of infections within El Salvador, which is strongly suggestive of a domestic Pegasus operator.

Thirdly, one of the targets at *El Faro* (Carlos Martínez) was targeted by TOROGOZ in an unsuccessful attempt with the ***FORCEDENTRY*** exploit. The exploit was fired at a non-vulnerable version of iOS (14.8.1).

# 4. Conclusion: Mercenary Spyware Continues to Harm Media, Civil Society

For years, researchers and civil society have sounded the alarm that the poorly regulated mercenary surveillance market is leading to widespread human rights and other abuses. The El Salvador case presents a textbook example of those concerns.

If indeed Pegasus was sold to El Salvador, it was done despite a panoply of warning signs that abuse would take place:

- An autocratic leaning President with a fascination with digital technology

- A long history of harassment of independent media and journalists

- A climate of insecurity and human rights abuses

- Poorly regulated police, intelligence, and private security firms

- A lengthy history of corruption, organized crime, state violence, and authoritarianism

The hacking of Salvadoran civil society organizations with Pegasus mercenary spyware reflects a familiar pattern observed time and again in authoritarian societies: the use of advanced technology to frustrate and interfere with this essential component of a democratic society. In this case, the hacking also fits within a broader trend of abusive targeting and attacks against civil society in El Salvador.

Especially troubling, however, is the pattern of targeting of independent Salvadoran media that this joint investigation has uncovered.

## Pegasus and the Media

Media organizations and individual journalists are now a regular target of hacking for NSO Group's government clients. A free and independent press is a threat to autocratic

rule and many of NSO Group's government clients are illiberal regimes. The voluminous hacking of Salvadoran media organizations and journalists is shocking but should come as no surprise.

Only a little over a year ago, we discovered government operatives used NSO Group's Pegasus spyware to hack 36 personal phones belonging to journalists, producers, anchors, and executives at the news organization *Al Jazeera*. The Citizen Lab and Amnesty International have also documented numerous other cases where journalists' phones were hacked with Pegasus, including *the New York Times*' Ben Hubbard, Sevinc Vaqifqizi, a freelance journalist for independent media outlet *Meydan TV*, Siddharth Varadarajan and MK Venu, co-founders of India's the *Wire*, Dániel Németh, a photojournalist working out of Budapest, and numerous others. According to investigations undertaken as part of the Pegasus Project, at least 180 journalists were selected as targets for potential Pegasus hacking.

Further highlighting the consistent threat posed by Pegasus to journalists, Daniel Lizárraga—a journalist whose phone we confirmed was hacked with Pegasus in this case—was also targeted in 2016 by the Mexican Pegasus operator while in a previous role at a Mexican NGO. Given the lack of due diligence and proper regulations, it should come as no surprise that individual victims of Pegasus hacking may have been targeted by multiple NSO Group clients over time, as Lizárraga's case illustrates.

The lesson from this case is obvious: an unregulated spyware marketplace is a grave threat to media worldwide, and to civil society.

## Appendix A: Hacking Timeline

The following table of dates of successful hacking *excludes* dates of attempted but unsuccessful hacking. This table is *not* intended to be a comprehensive inventory of every date that the spyware was active on a phone. Each entry represents a separate instance where NSO's exploits were fired at a phone resulting in successful infection.

Several factors can influence the number of times infections happen. For example, if a target is selected for persistent surveillance, the exploit may be fired more often if the user frequently reboots their phone, as modern versions of the Pegasus spyware are believed to feature persistence via re-exploitation. If the target does not reboot their phone, the spyware may run for some time without the exploit being fired again.

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| Noah Bullock | Cristosal | 1. On or around 2021-09-04 |
| | | 2. On or around 2021-09-28 |
| | | 3. On or around 2021-11-12 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| (Individual #1) | Diario El Mundo | 1. On or around 2021-06-03 |
| | | 2. On or around 2021-06-30 |
| Ricardo Avelar | El Diario de Hoy | 1. On or around 2020-08-31 |
| | | 2. On or around 2020-09-22 |
| | | 3. On or around 2021-02-21 |
| | | 4. On or around 2021-03-16 |
| | | 5. On or around 2021-03-26 |
| | | 6. On or around 2021-04-27 |
| | | 7. On or around 2021-06-15 |
| | | 8. On or around 2021-07-14 |
| | | 9. On or around 2021-09-04 |
| | | 10. On or around 2021-09-12 |
| Ana Beatriz Lazo | El Faro | 1. On or around 2021-10-04 |
| Carlos Dada | El Faro | 1. Sometime 2020-07-08 – 2020-07-17 |
| | | 2. Sometime 2020-07-17 – 2020-07-24 |
| | | 3. Sometime 2020-07-24 – 2020-07-30 |
| | | 4. On or around 2020-07-31 |
| | | 5. Sometime 2020-08-01 – 2020-08-14 |
| | | 6. Sometime 2020-09-08 – 2020-10-22 |
| | | 7. Sometime 2021-01-06 – 2021-01-12 |
| | | 8. Sometime 2021-01-12 – 2021-01-20 |
| | | 9. Sometime 2021-02-13 – 2021-02-23 |
| | | 10. Sometime 2021-03-31 – 2021-04-17 |
| | | 11. Sometime 2021-04-18 – 2021-05-12 |
| | | 12. Sometime 2021-05-26 – 2021-06-09 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| Carlos Ernesto Martínez D'aubuisson | El Faro | 1. Sometime 2020-06-29 – 2020-07-22 |
| | | 2. Sometime 2020-07-25 – 2020-08-06 |
| | | 3. Sometime 2020-09-07 – 2020-09-10 |
| | | 4. Sometime 2020-09-10 – 2020-09-18 |
| | | 5. Sometime 2020-09-18 – 2020-10-10 |
| | | 6. Sometime 2020-10-10 – 2020-11-05 |
| | | 7. Sometime 2020-11-05 – 2020-11-10 |
| | | 8. Sometime 2020-11-23 – 2020-12-02 |
| | | 9. Sometime 2020-12-02 – 2020-12-21 |
| | | 10. Sometime 2020-12-26 – 2021-01-21 |
| | | 11. Sometime 2021-02-11 – 2021-02-16 |
| | | 12. Sometime 2021-02-17 – 2021-02-19 |
| | | 13. Sometime 2021-02-23 – 2021-03-08 |
| | | 14. Sometime 2021-03-08 – 2021-03-11 |
| | | 15. Sometime 2021-03-19 – 2021-03-23 |
| | | 16. Sometime 2021-04-03 – 2021-04-12 |
| | | 17. Sometime 2021-04-12 – 2021-04-27 |
| | | 18. Sometime 2021-04-28 – 2021-05-06 |
| | | 19. Sometime 2021-05-06 – 2021-05-27 |
| | | 20. Sometime 2021-05-29 – 2021-06-02 |
| | | 21. Sometime 2021-06-16 – 2021-06-22 |
| | | 22. Sometime 2021-06-22 – 2021-06-24 |
| | | 23. Sometime 2021-06-27 – 2021-07-02 |
| | | 24. On or around 2021-07-08 |
| | | 25. On or around 2021-08-31 |
| | | 26. On or around 2021-09-15 |
| | | 27. On or around 2021-10-07 |
| | | 28. On or around 2021-10-21 |
| Daniel Lizárraga | El Faro | 1. On or around 2021-04-12 |
| | | 2. On or around 2021-04-15 |
| | | 3. On or around 2021-04-27 |
| | | 4. On or around 2021-05-20 |
| | | 5. On or around 2021-06-04 |
| | | 6. On or around 2021-06-15 |
| | | 7. On or around 2021-06-23 |
| | | 8. On or around 2021-07-08 |
| Daniel Reyes | El Faro | 1. Sometime 2020-10-01 – 2020-10-10 |
| | | 2. On or around 2021-11-04 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| Efren Lemus | El Faro | 1. On or around 2021-04-23 |
| | | 2. On or around 2021-04-26 |
| | | 3. On or around 2021-04-30 |
| | | 4. On or around 2021-05-20 |
| | | 5. On or around 2021-06-01 |
| | | 6. On or around 2021-06-08 |
| | | 7. On or around 2021-06-18 |
| | | 8. On or around 2021-07-10 |
| | | 9. On or around 2021-09-17 |
| | | 10. On or around 2021-09-25 |
| Gabriel Labrador | El Faro | 1. Sometime 2020-08-06 – 2020-09-07 |
| | | 2. Sometime 2020-09-11 – 2020-10-30 |
| | | 3. On or around 2021-03-25 |
| | | 4. On or around 2021-04-01 |
| | | 5. On or around 2021-04-06 |
| | | 6. On or around 2021-04-09 |
| | | 7. On or around 2021-04-12 |
| | | 8. On or around 2021-04-14 |
| | | 9. On or around 2021-04-16 |
| | | 10. On or around 2021-05-05 |
| | | 11. On or around 2021-05-07 |
| | | 12. On or around 2021-05-13 |
| | | 13. On or around 2021-05-17 |
| | | 14. On or around 2021-06-01 |
| | | 15. On or around 2021-08-31 |
| | | 16. On or around 2021-09-12 |
| | | 17. On or around 2021-10-06 |
| | | 18. On or around 2021-10-23 |
| | | 19. On or around 2021-11-04 |
| | | 20. On or around 2021-11-11 |
| Gabriela Cáceres | El Faro | 1. On or around 2021-04-17 |
| | | 2. On or around 2021-05-11 |
| | | 3. On or around 2021-05-15 |
| | | 4. On or around 2021-05-21 |
| | | 5. On or around 2021-06-06 |
| | | 6. On or around 2021-06-15 |
| | | 7. On or around 2021-06-17 |
| | | 8. On or around 2021-06-21 |
| | | 9. On or around 2021-07-14 |
| | | 10. On or around 2021-08-31 |
| | | 11. On or around 2021-09-08 |
| | | 12. On or around 2021-09-17 |
| | | 13. On or around 2021-09-24 |

| Individual | Organization | Dates of Successful Hacking |
| --- | --- | --- |
| José Luis Sanz | El Faro | 1. Sometime 2020-07-04 – 2020-07-09 |
| | | 2. Sometime 2020-07-09 – 2020-07-14 |
| | | 3. On or around 2020-07-16 |
| | | 4. On or around 2020-09-10 |
| | | 5. On or around 2020-09-23 |
| | | 6. On or around 2020-11-14 |
| | | 7. On or around 2020-11-21 |
| | | 8. On or around 2020-11-28 |
| | | 9. On or around 2020-12-03 |
| | | 10. On or around 2020-12-07 |
| | | 11. On or around 2020-12-10 |
| | | 12. On or around 2020-12-16 |
| | | 13. On or around 2020-12-19 |
| Julia Gavarrete (Phone #1) | El Faro | 1. On or around 2021-03-16 |
| | | 2. On or around 2021-04-08 |
| | | 3. On or around 2021-04-13 |
| | | 4. On or around 2021-04-14 |
| | | 5. On or around 2021-04-16 |
| | | 6. On or around 2021-04-18 |
| | | 7. On or around 2021-04-20 |
| | | 8. On or around 2021-04-23 |
| | | 9. On or around 2021-04-26 |
| | | 10. On or around 2021-05-05 |
| | | 11. On or around 2021-05-20 |
| | | 12. Sometime 2021-05-30 – 2021-06-06 |
| | | 13. On or around 2021-06-10 |
| | | 14. On or around 2021-06-28 |
| | | 15. On or around 2021-09-08 |
| Julia Gavarrete (Phone #2) | El Faro | 1. On or around 2021-02-23 |
| | | 2. On or around 2021-09-09 |
| | | 3. On or around 2021-09-27 |
| María Luz Nóchez | El Faro | 1. On or around 2021-02-17 |
| | | 2. On or around 2021-05-21 |
| | | 3. On or around 2021-06-09 |
| Mauricio Ernesto Sandoval Soriano | El Faro | 1. Sometime 2020-08-19 – 2020-10-20 |
| | | 2. On or around 2021-07-02 |
| | | 3. On or around 2021-07-06 |
| | | 4. On or around 2021-10-01 |
| Nelson Rauda | El Faro | 1. Sometime 2021-04-30 – 2021-05-01 |
| | | 2. On or around 2021-05-18 |
| | | 3. On or around 2021-06-16 |
| | | 4. Sometime 2021-06-18 – 2021-08-11 |
| | | 5. On or around 2021-08-31 |
| | | 6. On or around 2021-09-10 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| Óscar Martínez | El Faro | 1. On or around 2020-07-15 |
| | | 2. On or around 2020-07-21 – 2020-07-28 |
| | | 3. On or around 2020-08-12 |
| | | 4. On or around 2020-08-17 |
| | | 5. On or around 2020-08-19 |
| | | 6. On or around 2020-09-12 |
| | | 7. On or around 2020-09-29 |
| | | 8. On or around 2020-10-01 |
| | | 9. On or around 2020-10-03 |
| | | 10. On or around 2020-10-29 |
| | | 11. On or around 2020-11-12 |
| | | 12. On or around 2020-11-16 |
| | | 13. On or around 2020-11-18 |
| | | 14. On or around 2020-12-07 |
| | | 15. On or around 2020-12-10 |
| | | 16. On or around 2020-12-18 |
| | | 17. On or around 2020-12-20 |
| | | 18. On or around 2020-12-22 |
| | | 19. On or around 2021-01-08 |
| | | 20. On or around 2021-01-10 |
| | | 21. On or around 2021-01-13 |
| | | 22. On or around 2021-01-26 |
| | | 23. On or around 2021-01-27 |
| | | 24. On or around 2021-02-21 |
| | | 25. On or around 2021-03-08 |
| | | 26. On or around 2021-03-15 |
| | | 27. On or around 2021-03-18 |
| | | 28. On or around 2021-03-25 |
| | | 29. On or around 2021-04-01 |
| | | 30. On or around 2021-05-03 |
| | | 31. On or around 2021-05-21 |
| | | 32. On or around 2021-06-02 |
| | | 33. On or around 2021-06-16 |
| | | 34. On or around 2021-06-22 |
| | | 35. On or around 2021-06-23 |
| | | 36. On or around 2021-07-07 |
| | | 37. On or around 2021-08-30 |
| | | 38. On or around 2021-09-08 |
| | | 39. On or around 2021-09-27 |
| | | 40. On or around 2021-10-08 |
| | | 41. On or around 2021-10-25 |
| | | 42. On or around 2021-10-30 |
| Rebeca Monge | El Faro | 1. On or around 2021-10-07 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| Roman Gressier | El Faro | 1. On or around 2021-05-17 |
| | | 2. On or around 2021-05-21 |
| | | 3. On or around 2021-06-21 |
| | | 4. On or around 2021-06-23 |
| Roxana Lazo | El Faro | 1. On or around 2021-04-19 |
| | | 2. On or around 2021-04-27 |
| | | 3. On or around 2021-06-02 |
| | | 4. On or around 2021-06-07 |
| | | 5. On or around 2021-06-23 |
| | | 6. On or around 2021-06-24 |
| | | 7. On or around 2021-07-06 |
| | | 8. On or around 2021-09-10 |
| | | 9. On or around 2021-09-24 |
| | | 10. On or around 2021-10-02 |
| | | 11. On or around 2021-10-21 |
| | | 12. On or around 2021-11-02 |
| Sergio Arauz | El Faro | 1. Sometime 2020-08-12 – 2020-08-19 |
| | | 2. Sometime 2020-09-10 – 2020-09-11 |
| | | 3. Sometime 2020-09-13 – 2020-09-14 |
| | | 4. Sometime 2020-09-18 – 2020-09-22 |
| | | 5. On or around 2021-05-07 |
| | | 6. On or around 2021-06-02 |
| | | 7. Sometime 2021-06-09 – 2021-06-10 |
| | | 8. On or around 2021-06-11 |
| | | 9. On or around 2021-06-17 |
| | | 10. On or around 2021-06-24 |
| | | 11. On or around 2021-06-25 |
| | | 12. On or around 2021-07-02 |
| | | 13. On or around 2021-07-09 |
| | | 14. On or around 2021-10-21 |
| Valeria Guzmán | El Faro | 1. Sometime 2020-07-04 – 2020-07-14 |
| | | 2. On or around 2021-09-03 |
| | | 3. On or around 2021-09-29 |
| | | 4. On or around 2021-10-12 |
| | | 5. On or around 2021-10-25 |
| | | 6. On or around 2021-11-04 |
| | | 7. On or around 2021-11-11 |
| | | 8. On or around 2021-11-19 |
| Víctor Peña | El Faro | 1. Sometime 2021-11-22 – 2021-11-23 |
| (Individual #2) | El Faro | 1. Sometime 2020-09-09 – 2020-09-16 |
| | | 2. On or around 2021-09-30 |
| | | 3. Sometime 2020-11-16 – 2020-11-26 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| (Individual #3) | El Faro | 1. Sometime 2020-09-07 – 2020-10-17 |
| | | 2. Sometime 2020-11-30 – 2021-01-16 |
| | | 3. On or around 2021-05-21 |
| Jose Marinero | Fundación DTJ | 1. On or around 2021-04-08 |
| | | 2. On or around 2021-09-12 |
| Xenia Hernandez | Fundación DTJ | 1. On or around 2021-02-23 |
| | | 2. On or around 2021-03-17 |
| | | 3. On or around 2021-04-29 |
| | | 4. On or around 2021-05-01 |
| | | 5. On or around 2021-05-04 |
| | | 6. Sometime 2021-05-04 – 2021-05-07 |
| | | 7. On or around 2021-05-07 |
| | | 8. On or around 2021-05-11 |
| | | 9. On or around 2021-05-17 |
| | | 10. On or around 2021-05-21 |
| | | 11. On or around 2021-06-02 |
| | | 12. On or around 2021-06-13 |
| | | 13. On or around 2021-06-15 |
| | | 14. On or around 2021-06-28 |
| | | 15. On or around 2021-06-30 |
| | | 16. On or around 2021-11-09 |
| | | 17. On or around 2021-11-16 |
| Beatriz Benitez | GatoEncerrado | 1. On or around 2021-07-01 |
| Ezequiel Barrera | GatoEncerrado | 1. Sometime 2020-09-10 – 2020-09-11 |
| | | 2. Sometime 2021-04-06 – 2021-04-11 |
| | | 3. Sometime 2021-04-13 – 2021-04-16 |
| | | 4. Sometime 2021-04-23 – 2021-04-25 |
| | | 5. On or around 2021-06-07 |
| | | 6. On or around 2021-06-21 |
| | | 7. On or around 2021-06-30 |
| | | 8. On or around 2021-07-08 |
| | | 9. On or around 2021-09-19 |
| Xenia Oliva (Phone #1) | GatoEncerrado | 1. Sometime 2020-11-12 – 2020-11-25 |
| | | 2. Sometime 2021-02-17 – 2021-02-26 |
| | | 3. Sometime 2021-02-28 – 2021-03-09 |
| | | 4. On or around 2021-04-08 |
| | | 5. On or around 2021-05-21 |
| Xenia Oliva (Phone #2) | GatoEncerrado | 1. On or around 2021-10-26 |
| | | 2. On or around 2021-11-04 |
| (Individual #4) | La Prensa Gráfica | 1. On or around 2021-09-27 |
| Oscar Luna | Revista Digital Disruptiva | 1. On or around 2021-04-18 |
| | | 2. On or around 2021-09-29 |
| (Individual #5) | (NGO #1) | 1. On or around 2021-05-21 |

| Individual | Organization | Dates of Successful Hacking |
|---|---|---|
| Mariana Belloso | (Independent Journalist) | 1. On or around 2021-09-29 |
|  |  | 2. On or around 2021-10-09 |
| Carmen Tatiana Marroquín | (Economist and Columnist for Independent Media) | 1. On or around 2021-09-05 |